**WESTINGHOUSE ELECTRIC CORP. v. BULLDOG ELECTRIC PRODUCTS CO.**

Civ. A. No. 229–W.

United States District Court
N. D. West Virginia.

Aug. 4, 1952.

820

Carl S. Lloyd, Chicago, Ill., James M. Guiher, Clarksburg, W. Va., Ralph H. Swingle, East Pittsburgh, Pa., for plaintiff.

C. Lee Spillers, Goodwin, Nesbitt, Spillers & Mead, Wheeling, W. Va., S. Eugene Bychinsky, Detroit, Mich., Jacob L. Keidan, Butzel, Levin, Winston & Quint, Detroit, Mich., Cyrus G. Minkler, Arthur W. Dickey, Harness, Dickey & Pierce, Detroit, Mich., for defendant.

BAKER, District Judge.

This suit was brought by Westinghouse Electric Corporation against Bulldog Electric Products Company, charging the infringement of seven (7) patents owned by the plaintiff company. These patents are:

1. Re. 19,887, O. S. Jennings, dated March 10, 1936, original application filed April 20, 1929, for panel circuit breaker;

2. U. S. Patent No. 2,060,472 to Jerome Sandin, dated November 10, 1936, application filed April 22, 1927, for circuit breaker;

3. U. S. Patent No. 2,073,103 to C. H. Hodgkins, dated March 9, 1937, original application filed August 4, 1933, for circuit breaker;

4. U. S. Patent No. 2,190,517 to O. S. Jennings, dated February 13, 1940, original application filed December 17, 1936, for circuit breaker;

5. U. S. Patent Re. 21,429 to C. M. Petersen, dated April 16, 1940, original application filed November 23, 1934, for circuit control device;

6. U. S. Patent No. 2,329,362 to R. H. Swingle, dated September 14, 1943, application filed April 14, 1934, for circuit breaker;

7. U. S. Patent No. 2,229,412 to O. S. Jennings, dated January 21, 1941, original application filed December 17, 1936, for circuit breaker.

The plaintiff is a Pennsylvania corporation. The defendant is a corporation organized and existing under the laws of the State of West Virginia, but having its principal place of business in Michigan. There is no doubt that this court has jurisdiction of the proceedings, Title 28, §§ 1400 and 1338(a), U.S.C.; in fact, such jurisdiction has never been questioned.

The commercial devices manufactured by the defendant and alleged to infringe upon the patents in suit are circuit breakers. Two types of circuit breakers are involved, and are made and marketed by the defendant under the names "Circuit Master" and "Pushmatic."

As every modern householder knows, an electric circuit is designed and intended to carry a predetermined load. If, for any one of several reasons, this load is increased beyond the intended maximum, a great deal of trouble will ensue. Electrical devices may be injured or destroyed, and the building in which the circuit is in use may be set afire. In the very beginning of the use of electricity, it became apparent that some safeguard must be provided against this danger. The commonest device consists of inserting in the circuit a piece of wire which has a relatively lower melting point than the wire comprising the rest of the circuit. When the overload occurs, this piece of wire becomes heated and melts, thus breaking the circuit. This is the ordinary and commonly used fuse plug. The fuse plug has some very definite advantages. It is sure, it has no mechanical parts to get out of order, it is easily calibrated for a given load, and it is cheap to manufacture. On the other hand, the fuse plug has definite disadvantages. In operation, it destroys itself and, once it functions, it must be replaced by a new plug. This necessitates the householder keeping a supply of extra plugs on hand. It is also easy for the householder, who finds himself with a blown fuse and no extra ones available, to circumvent the protection furnished as, for example, by putting a penny in the socket and screwing the burned-out fuse against the penny. This results in a complete circuit, which is entirely unprotected against overloads.

A circuit breaker is a device which will break a circuit when a predetermined overload occurs, but which can be manually reset to restore the circuit. After such manual resetting, the same protection exists as before the circuit was broken. Circuit breakers of this type have been in use for many years, and are old in the art relating to the protection of electric circuits. However, these early circuit breakers were all designed for the control of relatively heavy currents. They were used in factories, on trolley cars, etc. In order for a circuit breaker to be useful in a dwelling or small commercial building, several requirements must be met. The breaker must be simple to operate; that is, it must be such a device that the householder is required merely to move a handle in order to reset the circuit. It must be certain to interrupt a circuit which carries a dangerous overload. It must operate in such a manner as not to imperil the building. What at first glance may seem a paradox, it must not operate too quickly. When a large bank of electric lights is turned on, or when a motor is being started, there is an instant for which the circuit carries voltage which, if continued, would be a dangerous overload. This, however, lasts only for a moment. The circuit breaker must be able to carry this momentary overload without breaking the circuit and, lastly, it must be capable of manufacture at a price to compete commercially with the cheaper fuse plug.

The complaint in the suit was filed November 10, 1943. Defendant moved for summary judgment on January 10, 1944, on the ground of alleged misuse of the patents in suit by the plaintiff. This motion was heard, and was denied on May 23, 1944. Defendant's answer to the complaint was filed on July 1, 1944, denying infringement of the patents in suit and raising defenses of invalidity of the patents, and of unclean hands on the part of the plaintiff arising out of the alleged misuse of the patents in suit.

On March 2, 1945, at a hearing of motions respecting proceedings between the same parties in an action then pending in United States District Court for the Eastern District of New York, which proceedings seemed likely to settle questions raised in the motions presented, this Court, without objection by either party, ordered the proceedings in this suit to be stayed pending final determination of the action then pending in the United States District Court for the Eastern District of New York. On May 17, 1948, on motion of plaintiff that the action between the parties in the United States District Court for the Eastern District of New York had been finally determined, an order was entered dissolving the stay of proceedings previously ordered on May 2, 1945, in the instant suit.

On May 24, 1948, defendant filed a new motion for summary judgment of dismissal on the ground of alleged misuse of the patents in suit by plaintiff. This motion was granted, and on April 12, 1949, an order was entered dismissing plaintiff's complaint after full hearing and arguments and briefs on behalf of the respective parties and in view of recently announced decisions of the U. S. Supreme Court in United States v. Line Materials Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701, and United States v. U. S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746, which the Court viewed as having changed the law applicable to the grounds of misuse of patents advanced by defendant. This decision is reported in 81 F.Supp. 987.

On May 6, 1949, plaintiff filed notice of appeal to the United States Court of Appeals for the Fourth Circuit from the summary judgment of dismissal, entered April 12, 1949. On January 4, 1950, the summary judgment of dismissal was reversed by the United States Court of Appeals for the Fourth Circuit, in a decision reported in 179 F.2d 139, and the case was thereafter remanded on February 20, 1950, to the Court for full trial upon the issues and determination of whether plaintiff is entitled to the relief prayed.

On June 29, 1950, defendant filed a motion under Rule 34, Federal Rules of Civil Procedure, 28 U.S.C.A. for production and inspection of documents in possession of plaintiff respecting the defense of the alleged misuse of the patents in suit, and also propounded interrogatories to the plaintiff respecting other issues in the case. Plaintiff opposed this motion and objected to certain of defendant's interrogatories.

On September 23, 1950, plaintiff filed a demand for trial pursuant to Rule 6(a) of Article 2 of the Rules of Practice for the Northern District of West Virginia, that it desired trial at the term of the Court commencing at Wheeling, West Virginia, on October 17, 1950.

On November 10, 1950, a hearing was had on defendant's motion to produce and inspect documents, and on plaintiff's objections to defendant's interrogatories, at which defendant's motion was denied and plaintiff's objections were sustained, and it was further ordered that the case be set down for trial on merits beginning on December 18, 1950. A severe snow storm intervening and interfering with travel and disposal of other business of the Court prior to the date set for the beginning of the trial, the case was reset for trial on the merits beginning on January 3, 1951, on which date the trial commenced and proceeded continuously thereafter until February 12, 1951, then the taking of evidence was completed—except for stipulated depositions in rebuttal on behalf of plaintiff, and an analysis of admitted evidence respecting prices bearing on defendant's defense respecting alleged misuse of patents, both of which were later filed—and time assigned for preparation of briefs by the respective parties.

All of the patents in suit, excepting Patent Re. 19,887 to Jennings, are directed to automatic electric circuit breaker constructions in which a switch capable of manual operation to open and close an electric circuit is provided with means for automatically opening the switch in the event the circuit is subjected to excess electric current of a predetermined value. These circuit breakers are designed to replace conventional switches and fuses for protecting electric circuits against excess or overload currents in homes and other buildings.

The Jennings Patent Re. 19,887 is directed to the use of such automatic circuit breakers in a panel arrangement, where switches and fuses have been previously and are presently being used.

The use of automatic circuit breakers such as those involved in this suit eliminates the necessity of replacing destructible fuses which are burned out and destroyed to interrupt the circuit when each overload occurs. The automatic circuit breakers may be manually manipulated to reclose and reestablish the electric circuits after the breakers have been automatically tripped by excess current or overload to open the circuit, and without any necessity of replacing destroyed fuses.

Such circuit breakers in general utilize a switch that can be manually operated when desired to open and close the circuit, and a current-responsive element such as a bimetallic member or an electro-magnetic device arranged to move, upon being subjected to electric current in excess of a predetermined value, to release the switch automatically so that it will move to open position under force of springs arranged for that purpose.

In general, such circuit breakers and the parts that go to make them up—such as terminals, contacts, fixed and movable, movable contact—or switch-arms, handles and springs, and various additional mechanical elements for moving the contact or switch-arm to open and closed position, and bimetallic and electro-magnetic devices for providing automatic opening of the movable contact or switch-arms—were old and known prior to the patents in suit.

Two circuit breakers made and sold by Defendant, known as the Circuit Master and the Pushmatic, and a panel board equipped with Circuit Masters and made and sold by defendant, are charged to infringe the patents in suit.

Defendant's panel board (Plaintiff's Exhibit 29) is charged to infringe claims 1, 4, 5, 6, 7 and 9 of the Jennings Patent Re. 19,887.

Circuit Master (Plaintiff's Exhibits 26 and 26a) is charged to infringe:

Sandin Patent 2,060,472, claims 8, 9 and 13;

Hodgkins Patent 2,073,103, claims 31, 32, 33, 41 and 44;

Jennings Patent 2,190,517, claims 15, 19, 20, 21, 23, 27, 31, 32, 33, 34 and 35;

Jennings Patent 2,229,412, claims 9, 10, 11, 12, 24, and 27 to 40 inclusive;

Swingle Patent 2,329,362, claims 27, 53, 54, 69, 70, and 76 to 80 inclusive.

Pushmatic (Plaintiff's Exhibits 32 and 32a) is charged to infringe:

Hodgkins Patent 2,073,103, claims 39, 40, 41, 42 and 43;

Jennings Patent 2,190,517, claims 20, 22, 23, 25, 28, 29, 30, 32, 33 and 34;

Petersen Patent Re. 21,429, claims 19, 20, 21, 22, 23 and 25.

No commercial use has been made of the circuit breakers of the constructions shown in the drawings and described in the specification of the Hodgkins Patent, 2,073,103, Jennings Patents 2,190,517 and 2,229,412, Swingle Patent 2,329,362, or Petersen Patent Re. 21,429.

No circuit breakers have been made commercially according to the claims in suit, 8, 9 and 13, of the Sandin Patent 2,060,472.

The panelboard of the Jennings Patent Re. 19,887 has had substantial commercial use.

The circuit breakers plaintiff claims to have been made commercially under any of the patents in suit are:

AB Breaker (Plaintiff's Exhibit 28) which is said to be covered by some claims of the Sandin Patent 2,060,472 which are not asserted in this suit;

The Multi-Breaker (Plaintiff's Exhibit 35) is said to be covered by the Hodgkins Patent 2,073,103 and the Swingle Patent 2,-329,362;

The Quicklag Breaker (Plaintiff's Exhibit 38) is said to be covered by the Jennings Patent 2,190,517.

However, the AB, Multi-Breaker, and Quicklag breakers bear little or no resemblance to the circuit breakers shown in the drawings and described in the specifications of the patents which are said to cover them.

824

It is admitted by plaintiff that each of these breakers, the AB, the Multi-Breaker, and the Quicklag, are covered by other patents not asserted in this suit to be infringed by defendant.

Defendant's circuit breakers, the Circuit Master and the Pushmatic, are substantially different in construction and arrangement of parts from the circuit breakers shown in the drawings and described in the specifications of any of the patents charged to be infringed.

Defendant's expert witness, Professor Paul L. Hoover, Head of the Electrical Department of Case Institute of Technology, testified and gave it as his opinion that none of the drawings and specifications of the patents charged to be infringed by the Circuit Master and the Pushmatic would be of aid or help in the design or construction of either the Circuit Master or the Pushmatic. The differences which he has pointed out in his testimony and upon which defendant relies to distinguish the Circuit Master and the Pushmatic from the constructions disclosed in the drawings and described in the specifications of the patents in suit are admitted in all material respects by plaintiff's expert witness, Mr. Stratton.

It is evident, also, that the Circuit Master and the Pushmatic are substantially different in construction and arrangement of parts from the plaintiff's commercial breakers, the AB Breaker, the Multi-Breaker, and the Quicklag Breaker.

And it is evident that defendant's Circuit Master and Pushmatic do not copy or imitate either the breaker constructions shown in the drawings and described in the specifications of the patents in suit, or plaintiff's commercial breakers, the AB, the Multi-Breaker, or the Quicklag.

Plaintiff has granted licenses under its patents for the manufacture of AB Breakers and Multi-Breakers, and also for the manufacture of Quicklag Breakers. Such of those licenses as are in evidence here contain a large number of circuit breaker patents other than the patents asserted in this suit to be infringed.

At one time defendant had a license under some Westinghouse patents which it cancelled in 1940, but which does not appear from the evidence to have included the patents in suit. It has appeared, also, during the course of this litigation that plaintiff offered a license to defendant under the patents in suit, but demanded price maintenance by defendant as a condition of any such license, and that later at a hearing before this Court on July 1, 1948, on defendant's motion for summary judgment based on defendant's contention that plaintiff was involved in an illegal price-fixing arrangement with others involving the patents in suit, plaintiff indicated willingness to grant license to defendant under the patents in suit without requiring price maintenance. Defendant has declined to take any such license and has elected to submit to adjudication by the Court its defenses against the charges of infringement asserted by the plaintiff.

### Jennings Patent Re. No. 19,887

Jennings Patent Re. 19,887 has been adjudicated invalid for want of invention as to claims 4 and 7 thereof in a prior suit entitled Westinghouse Electric & Mfg. Co. v. Powerlite Switchboard Co., in the United States District Court for the Northern District of Ohio, case decided March 18, 1943, reported at 57 U.S.P.Q. 169 and affirmed by the United States Court of Appeals for the Sixth Circuit in the decision dated June 1, 1944, reported at 142 F.2d 965. Claims 1, 5, 6 and 9 have not been adjudicated. No disclaimers of adjudicated claims 4 and 7 have been filed in the United States Patent Office.

The Jennings panel board structure described in the patent is aimed at two principal features, to prevent unauthorized tampering with the circuit breaker mechanism, and to provide a ventilating arrangement for providing air circulation around the breakers in the panel board and for handling arc gas emitted by the breakers when automatically opened by overload conditions in the circuit. The Jennings patent provides a panel box in which the breakers are arranged in two parallel rows on opposite sides of the bus bars which are disposed in parallel position lengthwise of the box in its lower central portion. The bus bars pro-

vide the incoming or input leads of the electric circuit and all of the breakers are connected thereto. Spaces are provided extending longitudinally of the box along the outer sides of the rows of breakers in which the branch wiring connected to the breakers is disposed. The parallel rows of breakers stop short of the bottom and of the top of the box so that the central space between them is open at the top and bottom to the spaces in the top and the bottom of the box and to the spaces along the outsides of the rows of the breakers. The open side of the box is provided with a cover panel secured in place by means of screws and which has a central opening in which a door is hinged. This screw-secured panel cover is also provided along the side edges of the central opening with inwardly projecting flanges which engage the tops of the breakers and covers the heads of the wax-capped screws by which the top parts or enclosures of the breaker casings are secured to the breaker bases. The central space between the parallel rows of breakers is also covered by a panel engaging the tops of the breakers and secured to a central partition or barrier which divides the central space between the breakers into two channels or conduits. Thus, the only portions of the breakers accessible upon opening the hinged door mounted in the central opening of the screw-secured cover panel are the handles of the breakers. The Jennings breakers shown in the patent are designed so that the breaker casings can be opened while in place in the panel board when the flanged cover is removed.

The bases of the breakers project inwardly into the central space between the rows beyond the breaker tops, and overlap or interlock above the bus bars and provide the bottom wall for the conduit between the breakers. The partition dividing the central space between the breaker tops into two flues or conduits is secured to the overlapping and interlocking portions of the breaker bases. The breaker tops are provided with wide openings at their inner ends for the purpose of passing arc gases, which may be generated when the breaker contacts separate under overload conditions, into the central flue or conduit between the breaker tops and the central barrier or partition.

The panel board art prior to the Jennings Patent Re. 19,887 is represented by United States Letters Patent to Wesley No. 926,-372, dated June 29, 1909; United States Letters Patent to Starrett No. 1,629,645, dated May 24, 1927, original application filed November 10, 1919; and United States Letters Patent to O'Neill No. 1,313,555, dated August 19, 1919.

These prior patents disclose panel boards in which switches and fuses are used to control the branch circuits, and disclose arrangements in common use prior to the Jennings patent. Switches and fuses are still used. According to the evidence, plaintiff continues to make a fusible line of panel boards, and fuse protected switches.

The prior patent to Von Hoorn No. 1,-786,796, dated December 30, 1930, application filed August 11, 1927, for "Circuit Breaker," clearly suggests the substitution of automatic overload circuit breakers in panel boards in place of switches and fuses. This patent does not disclose circuit breakers mounted in panel boards, but clearly states (specification, page 1, lines 11–26):

"An object of my invention is to provide a circuit breaker that will take the place of the usual entrance switch and fuse or main panel switch and the branch line fuses. In the case of a distributing panel, a main circuit breaker will be provided in a housing and the branch circuits are controlled by circuit breakers of smaller capacity than the main circuit breaker thereby eliminating the fuses from the circuit, the circuit breaker, in each case, being of such character that it will interrupt the circuit under overload and short circuit conditions and which enables restoration of the circuit by a simple movement of the operating handle."

There are also two instances of prior use of panel boards in which automatic overload circuit breakers are disposed. These are evidenced by stipulated depositions and constitute an installation in the Pittsfield Building in Chicago, Illinois, in October of 1927, which remained in continuous use

from that date until November of 1940, when the stipulated depositions were taken; and also a panel board installed in the Glassow residence at Minneapolis, Minnesota, in September of 1927, which remained continuously in use until 1940, when the testimony contained in the stipulated depositions was taken.

The panel board constructions disclosed in the Wesley, Starrett and O'Neill prior patents are substantially the same with respect to the arrangement of the circuit controlling devices, i. e., switches and fuses, as that of the Jennings Patent Re. 19,887 with respect to the arrangement of circuit breakers. Briefly, the Wesley, Starrett and O'Neill structures are characterized by the provision of two spaced, vertically-extending rows of switches and fuses having a channel or space therebetween which is open at its upper end and at its lower end and in which the bus bars constituting the input leads of the circuit are positioned, and having vertical spaces at either side of the rows of switches in which fuses, and the branch wiring leading from the switches, are positioned, and horizontal spaces across the top and bottom of the box at the ends of the rows of switches and fuses. They provide a central space between the rows of switches and fuses through which air or gas can pass from the bottom to the top of the box and circulate freely across the top and down through the vertical spaces arranged at the sides of the rows of switches and fuses. These prior panel boards are also provided with cover panels removably secured over the open side of the boxes which cover the fuses and branch wiring, and which are provided with central openings in which are hinged doors to give ready access only to the switch handles or buttons. The prior Starrett patent is provided with inwardly projecting flanges 39 and 40 (Figure 24), the inward ends of which engage the cover plates 38 that cover the tops of the switches and the central space between the rows of switches. These cover plates 38 are provided with holes through which the operating buttons of the switch project and together with the flanges 39 and 40 prevent access to everything except these operating

buttons. The Starrett patent states (specification, page 12, column 1, lines 27–32):

"Likewise, the flanges 39 and 40 cooperate with the assembled switch cover plates 38 and the barriers 26 and 37 to positively enclose the opening provided by the inner door 19, so that access is permitted only to the switch operating buttons."

The barriers 26 and 37 refer to partition members at the ends of the rows of switches which are spaced from the switches at each of the ends of the rows (Figure 3).

The prior O'Neill patent, which was considered by the Patent Office in granting the Jennings Patent Re. 19,887, discloses a similar arrangement with the exception that the inwardly projecting flanges 22 provided on the cover panel do not engage the tops of the switches 14, but project inwardly alongside their outer edges, as shown in Figure 2 of that patent, and prevent access to the fuses 15, which lie in rows alongside the rows of switches 14.

The prior Wesley patent, instead of using inwardly projecting flanges attached to the cover panel for shielding the compartments alongside the rows of switches in which the fuses are mounted, utilizes a pan member 10 having outwardly projecting flanges which engage the underside of the cover panel 3 of the box and the bottom of which lies over the tops of the switches and covers the central space between the rows of switches in which the bus bars are arranged. This pan is provided with openings through which the operating buttons 13 of the switches extend, and it prevents access, upon the opening of the inner door 12, to everything except the operating buttons of the switches.

The Pittsfield Building installation comprises three circuit breaker panel boards, two of which are called "duplex" panel boards. Each of these duplex panel boards comprises an enclosing metal cabinet having two hinged doors. Arranged in the cabinet behind the doors are two large circuit breakers having a central space between them and spaces at their outer sides between the breakers and the cabinet walls.

The doors are provided with openings therein so that, when closed, only the handles of the circuit breakers are accessible, and the means which secure the covers of the circuit breakers in place are not accessible. The central and side channels available for circulation of air between and around the breakers, both top, bottom and sides, are present.

The Glassow installation comprises a steel box in which are mounted two parallel rows of circuit breakers having a central space between the rows in which the bus bars are arranged and having spaces at both the top and the bottom of the rows, and also alongside the rows, in which the branch wiring is contained. When installed, the covers of the individual circuit breakers were removed and a steel panel provided which covered the entire open side of the box and which had openings to accommodate and make accessible the operating buttons of the circuit breakers. This cover panel completely concealed the circuit breakers and wiring within the box and made accessible only the operating buttons, so that no access could be had to the mechanism of the circuit breakers or the spaces surrounding them except by removal of this panel, which was secured in place upon the box by screws.

The Wesley, Starrett, Von Hoorn, Mayer and Maple prior patents and the evidence respecting the Pittsfield Building and the Glassow residence installations were before the courts in the case of Westinghouse Electric & Mfg. Co. v. Powerlite Switchboard Co., supra, in which Claims 4 and 7 of the Jennings Patent Re. 19,887 were held to be invalid.

Defendant's panel board, Plaintiff's Exhibit 29, closely resembles the structure and arrangement disclosed in the prior Wesley Patent No. 926,372 in the form and arrangement of the means for preventing access on the opening of the central door of the box to everything except the circuit breaker handles. In it, the circuit masters are arranged in two parallel rows; a row on each side of the central space in which the bus bars are mounted. Spaces are provided in the box, both above and below the rows of breakers, and along the outer sides thereof, in which the branch wiring is contained. The rows of breakers are mounted in spaced relation to the bottom of the panel box, so that there is space underneath the rows connecting the outer spaces alongside the rows with the central space between the rows. The central space between the rows is open at the bottom, and at the top except for a perforated fiber place installed at the top of the central space for the purpose of guarding against interference by tools with live parts of the circuit when repairs or installations are being made while the panel box is in service. The box is closed by an outer panel which is secured by screws over the open face of the box and which has a central opening in which a hinged door is mounted. Arranged across the tops of and covering the breakers is a pan, similar to the pan 10 of Wesley, which is provided with outwardly projecting flanges around its edges which engage the underside of the cover panel and prevent access, upon opening of the central door, to the spaces in the box alongside the rows of breakers in which the branch wiring is contained. The bottom of the pan is provided with openings through which only the breaker handles extend, and which covers not only the breakers, except for the handles, but also the central space between the rows of breakers in which the bus bars are contained. Consequently, defendant's panel box, like that of Wesley, exposes only the breaker handles when the central hinged door in the cover is open and prevents access to the breakers and to the bus bars and branch wiring, which may be had only if the outer panel is removed by releasing the screws which secure it in place. Thus, it is apparent that defendant's panel box is substantially like that of the prior Wesley patent except for the fact that circuit breakers, instead of switches and fuses, are mounted in it. There is evidence that, prior to the Jennings Patent Re. 19,887, defendant used a panel box of similar construction except that the outer panel was provided with inwardly projecting flanges which projected inwardly substantially to the top of the plate or pan which covered the switches,

and the central space between the switches containing the bus bars, except for the projecting switch handles.

Not only are the circuit breakers installed in defendant's panel box of a different construction from those shown by the Jennings Patent Re. 19,887 in the panel box there described, but the central space between the rows of circuit breakers is differently handled and arranged, in the respect that Jennings provides central conduits or flues between these rows of breakers which are separated from the central compartment in which the bus bars are contained and which are also provided with an additional central partition or barrier which divides the central space between the rows into two separate conduits, one for each row of breakers. The inwardly projecting bases of the Jennings breakers overlap and interlock to cover the bus bars and to provide the bottom wall of a central space between the breakers above the bus bars into which open the large vent openings in the enclosures or upper parts of the Jennings breaker casings. Arc gases emitted by the Jennings breakers thus pass into these central spaces, and air circulating in the box will pass upwardly through these central spaces or conduits which are open only at the bottom and at the top. No space or opening is provided so that arc gases or air between the rows of breakers may pass underneath the rows to the spaces outside the rows, as in defendant's construction, or as in the prior switch and fuse panel boards in which spaces were provided between the switches in the rows communicating the central space between the rows with the spaces along the outside of the rows.

In view of the prior art, there can be no patentable invention broadly in substituting circuit breakers for switches and fuses in the panel boxes shown in the prior art. The idea of doing this was suggested by the Von Hoorn patent (a Westinghouse patent), the application for which has a filing date of August 11, 1927, prior to any date claimed for the Jennings Patent Re. 19,887, the filing date of which is April 20, 1929. In any case it would be well within the realm of ordinary mechanical skill in that art.

Claims 4 and 7 of the Jennings patent are the so-called "anti-tampering" claims which were held invalid for want of invention in the prior decisions, supra, in Westinghouse v. Powerlite Co.

These Claims 4 and 7, considered in the light of the specification and drawings of the Jennings patent, have reference to the combination of the circuit breaker structure and particularly the circuit breaker case structure employed by Jennings with the panel box. The Jennings panel board employs breakers like the physical specimen, Plaintiff's Exhibit 28, having bases 27 secured to the box 6 to which all electrical connections are made. These bases carry the breaker parts. The covers or tops 56 or enclosures, as they are called in the claims, fit down on the bases 27 and are attached to the bases by screws 59 which are covered by a sealing compound 64 and which are presented and accessible at the tops of the breakers. To conceal the seals 64, Jennings provided a panel cover 9 with downwardly depending flanges 71 which engage in grooves 72 in the breaker covers 56, or enclosures. By removing the panel 9 and its flanges 71 and the plate 67 covering the central space between the rows and chipping out the wax 64, the screws 59 which secure the breaker tops to the breaker bases may be removed and the covers 56 or enclosures lifted off without in any way disturbing the breaker mechanism or the breaker bases 27 or the electrical connections made therewith. Thus, the Jennings construction is designed so that the breakers can be opened while in place in the panel board; and the wax seal 64, if disturbed, serves as a signal to show whether the breaker mechanisms have been tampered with.

Defendant's circuit master breakers are of a different construction than those of Jennings in that they are of the side opening type, i. e., the covers are flat cover plates applied to the sides of the breaker cases and secured in place by a series of five rivets. The circuit masters are mounted side-by-side in rows with the rivets in one breaker concealed by the back of the adjacent breaker case. Consequently, to gain access to the interior of the circuit

masters, it is necessary to electrically disconnect them and to remove them bodily from the panel board, after which the five rivets must be cut away in order to remove the cover of the breaker casing to expose the breaker mechanism. Thus, defendant's breakers, in any feasible or practical sense, cannot be tampered with while in place in the panel board, as can the breakers of the Jennings patent.

Claim 4 specifies a plurality of circuit breaker units within the housing or panel box,

> "* * * each comprising a base, a circuit breaker mounted thereon, an enclosure for the circuit breaker, and means for attaching the enclosure to the base constituting a seal accessible from the exterior of the enclosure, * * * a cover for the housing * *, and covering the said seal and preventing access thereto so long as the cover is in position on the housing."

The phrasing aptly describes the Jennings structure, wherein removal of the cover 9 gives immediate access to the sealing wax 64 covering the securing screws 59; but the phrasing does not describe defendant's panel board, wherein removal of the pan covering the breakers fails to give access to the rivets which secure the covers of the circuit masters to the breaker casings. At best, removal of the pan in defendant's panel board makes it possible to completely remove a circuit master from the panel board, so that it may thereafter be disassembled by cutting out the rivets and removing the flat cover from the side of the breaker casing. The pan in the defendant's panel board does not cover any seal and prevent access thereto "so long as" the flanged panel box cover is in position on the housing, as contemplated in the Jennings structure and arrangement where removal of the flanged cover makes the "seal" and the screw securing the breaker top to the breaker base immediately accessible. Furthermore, the seal mentioned in the claim describes the seal in the disclosure of the Jennings patent which is not present in defendant's circuit master. That is to say that in Jennings, the seal referred to is the

wax 64 covering the head of the screw 59; and, if the wax and screw be considered as the complete means for sealing the Jennings breaker enclosure to the breaker base, it is substantially different from the rivets of the circuit master if they are considered to be means for sealing the breaker cover to the breaker casing, in the respect that the Jennings seal and sealing means is obviously designed to permit access to the breaker mechanism by removing the breaker enclosure or top while the breaker is in position in the box, and by disturbance of the wax to signal to the service people that unauthorized access has been had to the breaker mechanism. In the circuit master, it is obvious that no access to the breaker mechanism while the breaker is in place in the panel box is contemplated, and in any case it could not be had, except possibly to the breaker at the end of the row, except by completely removing the whole cover panel, the pan covering the breakers, and then disconnecting the breaker from the electrical circuit, removing it from the box, and cutting out the rivets.

Thus, Claim 4, considered in the light of the specification of the Jennings patent, is not infringed.

Claim 7 is substantially the same as Claim 4 except that it does not mention the word "seal." It describes the circuit breakers in the housing or panel box as,

> "* * * each comprising a base, a circuit breaker mounted thereon, an enclosure for the circuit breaker and means for attaching the enclosure to the base, * * * and means for covering said attaching means and preventing access thereto so long as the cover means is in position."

The "means for covering said attaching means" refers to the flanged cover panel of the Jennings construction, the removal of which gives access to the Jennings breakers and permits removal of the breaker covers from the breaker bases while the breakers remain in place in the box and connected in the circuit. As pointed out in connection with Claim 4, the means for covering the breakers in defendant's panel box, which is the pan, will not, upon removal, give access

to the means which attach the breaker covers to the breaker casings of the circuit masters, which are the five rivets. Thus, while the pan which covers the circuit masters in defendant's panel box will prevent removal of the circuit masters from the panel box so long as the pan is in place, it does not serve the function contemplated for the cover in the Jennings construction of giving access to the means securing the breaker covers to the breaker casings and permitting their removal while the circuit masters remain in place in the panel box and connected in the circuit.

Claim 7, therefore, is not infringed by defendant's panel board, plaintiff's Exhibit 29.

Moreover, if these claims 4 and 7 are given a construction which will enable them to cover and include defendant's panel board, as contended for by plaintiff, then they are invalid for want of invention over the prior art, and particularly the prior patent to Wesley, whose pan arrangement for preventing access to the switches and fuses is substantially identical with the pan arrangement of defendant's panel board for preventing access to the circuit breakers, as there was no patentable invention in mounting circuit breakers in the panel box arrangement shown in the Wesley patent as defendant has done.

The prior panel installations of automatic circuit breakers in the Pittsfield Building in Chicago and in the Glassow residence in Minneapolis disclose it to have been old prior to Jennings Patent Re. 19,887 to mount circuit breakers in panel boards or boxes in spaced rows and to provide covers that gave normal access only to the operating handles and concealed the mechanisms and connections of the breakers, and which also provided for air circulation in the panel box around the breakers.

Prior patent to Von Hoorn No. 1,786,796, dated December 30, 1930, application filed August 11, 1927, discloses an automatic circuit breaker expressly stated to be for use in panels in place of switches and fuses. It discloses a construction to be sealed or locked to prevent unauthorized access to

the breaker mechanism, as stated in the specification, page 3, col. 2, lines 103–107:

"The extension 55 is provided with an opening 57 for receiving a seal or lock hasp for preventing unauthorized access to the mechanism within the cover."

Prior patent to Mayer No. 1,887,274, dated November 8, 1932, application filed August 19, 1925, discloses a circuit breaker suitable for use in panels, and in Fig. 8 it is shown mounted behind a cover panel that permits access only to the operating buttons.

In both the Von Hoorn and Mayer patents the circuit breaker mechanism is mounted on a base and enclosed by a cover or enclosure fitting down over the mechanism and secured to the base by fastening means which are accessible at the top of the cover and in position to be covered by the flanges of the flanged panel box covers such as used in the panel box of the prior Starrett Patent No. 1,629,645, or that of the Jennings Patent Re. 19,887 in suit, or by the cover pan arrangement of the prior Wesley Patent No. 926,372.

The use of seals for protecting the means for fastening the circuit breaker covers or tops to the bases is clearly taught in the Von Hoorn patent, and it is conceded that sealing screws in place by capping the heads with wax is an old expedient.

Prior patent to Maple No. 1,261,256, dated April 2, 1918, discloses two automatic circuit breakers mounted behind a cover panel which prevents access to the breaker mechanism and exposes only the operating buttons.

In view of this state of the art prior to Jennings Patent Re. 19,887 in suit, illustrated by the Pittsfield Building and the Glassow residence prior uses, the Von Hoorn, Maple, Mayer, Starrett and Wesley prior patents which were not considered by the Patent Office in granting claims 4 and 7, it is held that claims 4 and 7 of the Jennings patent in suit express nothing more than a panel box of the prior Wesley patent equipped with circuit breakers such as those of the Von Hoorn or Mayer prior

patents in place of the switches and fuses shown in the Wesley patent, and that such claims are clearly invalid for lack of patentable invention.

■ Claims 1, 5, 6, and 9 of Jennings Patent Re. 19,887 are directed to the arrangements for providing ventilation around the circuit breakers in the panel box and for conducting away the arc gas discharged from the breakers when the contacts are opened automatically upon occurrence of overload.

The plaintiff makes some point of the business of disposing of the arc gas discharged by the breakers when they open automatically on overload. Admittedly, overload opening of the breakers is not a frequent occurrence, the amount of arc gas discharged is not known but is small, and while it may have some momentary effect of reducing the dielectric or insulating strength of the normal air or atmosphere surrounding the breaker contacts and its early dissipation may be desirable, no serious or critical effects of its presence are in evidence. Some flashing may also occur upon separation of the contacts on overload before the arc is extinguished. However, this is of infrequent occurrence, and of only momentary duration, and is usually provided for in construction of the breakers themselves, which are at times provided with arc extinguishing means such as the so-called "de-ion" grids surrounding the area of the breaker contacts, or a substantially closed chamber for containing the flash and having a restricted or screened vent. Venting of breakers or breaker casings is also an old expedient used where desired; and venting them into a common conduit is also old, as disclosed in prior patents to Burnham No. 1,562,739, dated November 24, 1925, and Greene No. 1,741,-839, dated December 31, 1929, application filed February 18, 1927, showing the venting of large circuit breakers to common conduits where a considerable quantity of gas is involved.

In the Jennings patent, the circuit breaker casings are provided with large openings, adjacent to the contacts, which open into the central passage or conduit provided above the breaker bases and between the breaker casings and the central partition dividing the space between the breaker rows.

In defendant's circuit masters, the vents on the breaker casings are much smaller and would, as admitted by plaintiff, substantially reduce any flash emitted from the breaker on automatic opening on overload. In any case, there are no patents or claims asserted to be infringed which cover only circuit breakers having vented cases.

In defendant's panel board, the circuit masters are arranged with the vents opening into the bus bar space between the rows of breakers, and this space is not divided by any partition, as in the Jennings patent, and it is open not only at the top and bottom of the central space, but also beneath the breakers to the spaces in the box along the outer sides of the breaker rows.

Claim 1 calls for a breaker panel with two spaced rows of breaker units with the vent openings communicating with the space between the rows and,

"* * * a closure for the space between the rows constituting a conduit for conducting arc gas discharged from said openings."

Claim 5 calls for,

"* * * a closed common conduit into which arc gases are discharged from the circuit breaker units * * *."

Jennings has a closed conduit, as pointed out previously, which is separate from his bus bar compartment and constitutes a conduit which is open only at the top and at the bottom. This comes about in the Jennings construction by the overlapping breaker bases which form the bottom of the conduit, the central partition or barrier which forms one side of it and the cover plate for the space between the rows which forms a third side, while the ends of the breaker tops or enclosures containing the vent openings form the fourth side. Defendant's panel board does not have this closed conduit of the Jennings patent. Defendant vents his breakers into the bus bar space between the rows, and that space is open not

only at the top and bottom to communicate with the spaces in the box above and below the rows of breakers, but also underneath the rows of breakers to communicate with the spaces in the box along the outer sides of the rows.

There is no teaching in the Jennings specification that this closed conduit shown in the drawings and described in the specification can be dispensed with and the breakers left to vent merely into the bus bar space, which was present in the prior patents, above referred to, showing panel boards equipped with switches and fuses.

Plaintiff contends that the claims should be construed broadly so that they will cover the arrangement in defendant's panel board where the only conduit for the arc gases emitted by the breakers is the central bus bar space which was present in the panel boards of the prior art illustrated by the prior Wesley and O'Neill patents.

It is apparent that this conduit between the rows of breakers of defendant's panel board is the same space that was present in the switch and fuse panel boards of the prior patents referred to, and that it is not the conduit which Jennings was at pains to provide in his construction, which was entirely closed not only from communication with the space occupied by the bus bars but also from any communication with the spaces along the outer sides of the rows of breakers, and in which also the central space between the rows of breakers was divided by a partition so that either row of breakers was always protected from the flame or gases emitted by the opposite row of breakers. This latter provision may have been due to the fact, brought out by defendant's expert witness, that the Jennings breakers are provided with large vent openings and the partition needed to protect each row of breakers from flashes emitted by the opposite row, which condition is not present in defendant's panel board equipped with circuit masters in which the vent openings are small and the flash substantially contained within the breaker casing.

Claim 6 specifically requires,

" * * * means including a continuous barrier disposed opposite the said

openings (vent openings) * * * to form a substantially vertically extending flue for conducting the discharged gases from the circuit breaker units."

Claim 9 specifically requires,

" * * * a continuous barrier disposed opposite the said openings (vent openings) * * * to form a substantially vertically extending passage, * * *."

The continuous barrier referred to in claims 6 and 9 is the barrier or central partition 31 disclosed in the Jennings drawings and described in the specification which separates the rows of breakers from one another. Defendant's panel board has no such central partition or continuous barrier. Plaintiff contends that the continuous barrier should be taken to mean the opposite row of breakers in defendant's panel board.

However, the constructions contended for by plaintiff do not distinguish patentably from the prior art illustrated by the prior patents to Wesley and O'Neill, when applied to defendant's panel board. This is so for the reason that the flue or conduit in defendant's panel board is the central bus bar space between the rows of breakers which is open not only at its top and its bottom to the upper and lower spaces in the panel box, but also beneath the rows of breakers to the side spaces in the panel box, and is essentially and substantially nothing more than the central bus bar space of the prior Wesley and O'Neill patents, which is open not only to the spaces in the upper and lower portions of the box but also between the switches to the spaces along the outer sides of the switch rows. The ventilating and flue arrangements of defendant's panel box are nothing more than those of these prior patents. The continuous barrier called for by Claims 6 and 9 of the Jennings patent is not present in defendant's panel board and, in view of the Jennings specification, which provides a barrier between the rows of breakers which is separate and distinct from the breaker casings and present for a reason not required in defendant's panel board, defendant's rows of breakers may not be considered as the barriers contemplated by these claims.

If the Claims 1, 5, 6 and 9 of the Jennings patent are to be given a construction broad enough to include defendant's panel board, then those claims are invalid for want of patentable invention over the prior Wesley and O'Neill patents as they would be so broad as to cover merely the idea of arranging circuit breakers in the panel boxes taught by these prior patents, in the place of switches and fuses, and this in view of these prior patents and of the prior patent to Von Hoorn, which clearly suggested the substitution of circuit breakers for switches and fuses in panel boxes, would not amount to patentable invention.

Defendant's panel board (Plaintiff's Exhibit 29) does not respond to or infringe Claims 1, 5, 6 and 9 construed in the light of the specification and drawings of the Jennings Patent Re. 19,887 and in view of the prior art.

### Sandin Patent No. 2,060,472

▆▆▆ The Sandin Patent 2,060,472 discloses a large type of air circuit breaker. Claims 8, 9 and 13 only, out of a total of 34 claims contained in the patent, are claimed to be infringed by Circuit Master.

The circuit breaker of the Sandin patent is directed to an improved construction in circuit interrupters. Its features are summarized in the specification, page 2, col. 2, lines 61 through 73:

"It will thus be seen that I have provided a circuit breaker that is characterized by a snap action both in its circuit making and circuit breaking operations. I have also devised a circuit breaker that moves to closed position in two distinct operations. The first operation causes the movable contact member to advance part way. Further progress is temporarily retarded by a latch mechanism during the period in which compression springs are placed under stress. The latch mechanism is then released and the compression springs drive the movable contact member the remainder of the distance to closed position with a snap action."

Sandin has provided a pivoted operating handle member 26 and a separately pivoted switch arm 15 which is continuously biased to the open position by a spring 17 and carries the movable contact 42. Sandin interposed—between his pivoted operating handle 26 and his separately pivoted contact carrying switch arm 15—an elaborate train of mechanism including a handle carried "actuator" 21, a pair of closing springs 23, a biasing spring 30, a latch 32, a pin 19, a hook 18, and toggle levers 12 and 14. Plaintiff admits that this train of mechanism is essential in the Sandin construction shown in the drawings and described in the specification; that it is essential that the actuator element 21 of this train be separate from the switch arm 15 and that it move relative to the handle 26 and relative to the switch arm 15 under all conditions of operation, both manual and automatic; and that it is this actuator 21 which is referred to in claims 8 and 9 as "an actuating member" and in claim 13 as a "floating member for actuating, etc."

Circuit Master wholly eliminates the intermediate train of mechanism between the handle and switch arm employed by and essential to the Sandin construction. Circuit Master carries its switch arm and movable contact directly by the handle, and under all manual operating conditions the handle and switch arm move together as an integral unit. By reason of the elimination of the mechanical elements between the handle and switch arm employed by Sandin, Circuit Master has substantially different operating characteristics than Sandin. Circuit Master lacks the "snap closing" and "snap opening" action of the Sandin mechanism. Sandin's "snap closing" and "snap opening" action and movement cannot be slowed down or restrained by restraining the handle, whereas in Circuit Master, all opening and closing movements are under control of the handle in manual operation and can be slowed down or stopped by restraining the handle. Defendant's expert, Professor Hoover, testified that he could see no way in which knowledge of the Sandin structure would aid one in designing the Circuit Master.

Claims 8, 9 and 13 are very broadly worded, and if broadly construed to reach and include Circuit Master, would also

834

include prior art represented by U. S. patent to Hodgkins No. 1,660,874, dated February 28, 1928, application filed July 15, 1920, prior to any date claimed for the Sandin patent; and also the British patent to Holmes for Improvements In Combined Electric Switches and Automatic Circuit Breakers No. 17,888 of 1905.

Neither of these prior patents were cited by the Patent Office during the prosecution of the application which resulted in the grant of the Sandin patent on November 10, 1936. Plaintiff has called attention to the fact that an earlier Hodgkins patent No. 1,424,304 was noted by the Patent Office in the consideration of the application for the Sandin patent. However, this earlier Hodgkins patent, while mentioning the possibility of adding overload responsive mechanism for automatically tripping the circuit interrupter, does not disclose or describe any such mechanism. It teaches only a manually controlled circuit interrupter having no automatic trip features on overload and was so regarded by the Patent Office.

The Hodgkins Patent 1,660,874 is directed to the same general class of large circuit breakers, as is the Sandin patent, and discloses a structure having the same functional characteristics as are found in the Sandin patent, in that Hodgkins' breaker is of the trip free handle type and it has the true "snap opening" and "snap closing" characteristics possessed by the Sandin breaker which may not be controlled by the handle after initiation of the opening or closing movement. This Hodgkins patent is provided with a switch arm 11 which carries movable contacts 5 and is continuously urged to open position by tension spring 25. These elements correspond to the switch arm 15, the movable contact 42 and continuously acting spring 17 of the Sandin patent. In the Hodgkins patent the handle structure 6–15–16–17 is releasably connected to the arm 21 of the switch arm 11, through an intermediate train of mechanism comprising the overcenter spring 42, levers 27 and 33, toggle links 34 and 35, and a latch member 38 which controls the toggle links 34 and 35, as Sandin's so-called actuating element 21 controls his toggle links 12–14. It is demonstrated in the testimony by defendant's expert that claims 8, 9 and 13, considered and read without regard to the specification and drawings of the Sandin patent, will include the circuit breaker of the prior Hodgkins Patent No. 1,660,874. Plaintiff contends that the Hodgkins element 38 does not correspond to the Sandin actuating element 21 because it is not carried by Hodgkins' handle and is not a member through which force is transmitted. However, the Hodgkins toggle controlling element 38 is dependent upon the handle structure for support, which is true of the actuating element 21 of the Sandin structure, and as the Hodgkins element 38 is the element which keeps the Hodgkins toggle links 34 and 35 in a straightened condition necessary to the closing of the contacts, which is a primary function of the Sandin actuating element 21 with respect to the Sandin toggle links 12–14, it is obvious that force must be transmitted through the Hodgkins element 38. Consequently, the Hodgkins patent responds to the terms of claims 8, 9 and 13 if given the broad construction contended for by plaintiff.

The British patent 17,888 of 1905 discloses an overload circuit breaker which has "snap opening" characteristics under both manual and automatic operating conditions, and which, like Sandin, is trip free of the handle under automatic conditions. The structure of the British patent, however, does not cause the breaker to close with a snap action and is, therefore, not applied to claims 8 and 9 of the Sandin patent, which do require closing with a snap action. However, as was demonstrated in the testimony, it does apply to and answer claim 13 of the Sandin patent which does not recite snap closing of the breaker. Plaintiff contends that the British patent does not respond to claim 13 of Sandin on the argument that link 14 of the British structure performs no actuating function in the automatic opening of the circuit as does actuating element 21 of Sandin, and on the argument that link 14 of the British patent is not carried by the handle. However, claim 13 does not require that the "floating member for actuating said contact means" be carried by the handle, and further, the

link 14 of the British patent is carried by the handle as well as by the toggle links 2 and 3. Further, the circuit breaker of the British patent cannot open on overload conditions unless its link 14 (the floating member, etc., mentioned in claim 13) pivots relative to the handle and relative to the toggle links 2 and 3, and the link 14 in manual operation must actuate the toggle links 2 and 3 to open and close the breaker. Consequently, construed broadly and without reference to the specification of the Sandin patent, claim 13 of Sandin is answered by the prior British patent 17,888.

The Circuit Master, in addition to lacking the train of mechanism interposed between the Sandin handle and the Sandin switch arm for operating the switch arm and which is essential to the operation of the Sandin breaker as described in the specification, but which except for actuating element 21 are not specifically included in claims 8, 9 and 13, does not respond to the claims alleged to be infringed when considered and read in the light of the Sandin specification, in the following respects.

Each of claims 8 and 9 recite:

"* * * a spring stressed during movement of said handle to close the circuit for moving said contact to closed position with a snap action."

In the Sandin breaker the snap closing action of the contacts cannot be stopped or retarded by the handle after the movement has been initiated by the handle. In the Circuit Master, quick or snap closing of the contacts can be obtained only if the handle is released. Both opening and closing actions in Circuit Master in manual operation always remain subject to control by the handle. Consequently, the different structure of Circuit Master fails to provide the "spring stressed during movement of said handle to close the circuit for moving said contact to closed position with a snap action" called for by claims 8 and 9 when these claims are read in the light of the Sandin specification.

Further, each of claims 8 and 9 require:

"* * * an actuating member carried by said handle member and pivotally movable about a pivot point ec-

centric to the pivot point of said handle member when the contact is in closed position, * * *."

And claim 13 requires:

"* * * a floating member for actuating said contact means to both open and close the circuit, * * *."

This "actuating member" or "floating member" is the element 21 of the Sandin structure, which must be separate from the Sandin switch arm 15 and must move relative to the handle and relative to the switch arm under all operating conditions. This element 21 of Sandin is described in the specification, page 2, col. 1, lines 14-17:

"and since the frame or actuating element 21 is movable bodily in the slot 27, due to the fact that it has no fixed pivot point, it is a floating member."

Plaintiff contends that the switch arm of Circuit Master corresponds to this "actuating member" or "floating member" of claims 8, 9 and 13, although conceding that when the claims are applied to the Sandin structure that this actuating or floating member is a mechanical element entirely separate and distinct from Sandin's switch arm 15. Obviously, in the Sandin structure this "actuating member" or "floating member" 21 is a mechanical element entirely separate and distinct from the Sandin switch arm 15, and in Sandin the element 21 is connected to the switch arm 15 only through the interposition of toggle members 12-14. There is no corresponding structure in Circuit Master which has the switch arm mounted directly on the handle without interposition of any actuating member or toggle members therebetween. Furthermore, the switch arm of the Circuit Master is not a floating member which has no fixed pivot point such as the actuating element or floating member 21 described in the Sandin specification. In Circuit Master the switch arm in manual operation moves as a unit with the handle member. In overload operation the switch arm pivots relative to the handle member which remains stationary, but this is a fixed pivotal connection between the switch arm and the handle member which has no pivotal action during manual operation and which is a

fixed pivot between handle and switch arm on overload operation.

Claim 13 also requires:

"* * * a slot and pin connection between said operating member (i. e., handle) and said floating member, * * *."

In the Sandin specification the floating member 21 is mounted upon a pin 22 (Fig. 2) and as stated in the specification, page 2, col. 1, lines 12–17:

"The shaft 22 moves in a slot 27 formed in the saddle member 26 for a purpose to be hereinafter described, and since the frame or actuating element 21 is movable bodily in slot 27, due to the fact that it has no fixed pivot point, it is a floating member."

Circuit Master lacks the "floating member" to which the claim refers, and it also lacks the slot and pin connection above described in the Sandin specification between the operating member (Sandin handle 26) and the Sandin floating member 21 which permits the member 21 to float in the slot 27 in the handle member 26 without a fixed pivot point in the opening and closing operations of the Sandin breaker. In Circuit Master, while there is a pin and slot connection between the handle and switch arm, this serves only as an abutment and to permit ease of assembly of switch arm to handle and not for the purpose of permitting the Circuit Master switch arm to float without a fixed pivot point relative to the handle during operation, as is the case with the pin and slot connection between Sandin's floating member 21 and handle 26.

It is therefore held, in view of the substantial differences in construction and operation of parts between Circuit Master and the breaker described in the Sandin specification, and the fact that the Sandin specification does not teach or suggest the Circuit Master construction, that the Sandin claims 8, 9 and 13, construed in the light of the Sandin specification, are not infringed by Circuit Master.

During the course of the trial, plaintiff offered a sketch (Plaintiff's Exhibit 17) of an imaginary reconstruction of the device shown in the drawings and described in the specification of the Sandin patent in an endeavor to eliminate the toggle mechanism between the handle and the switch arm in the Sandin device, and to eliminate the movable switch or contact arm of Sandin mounted and pivoted separately from the handle. This is an imaginary reconstruction by plaintiff's expert made at the trial, not originated by Sandin, not before the Patent Office when it granted the Sandin patent, and never constructed or used. It is an afterthought and can have no bearing on the construction to be given the Sandin patent or its claims.

It is, therefore, held with respect to the Sandin patent No. 2,060,472 that the claims 8, 9 and 13 charged to be infringed must be read and construed in the light of the Sandin specification and when so construed are not infringed by the Circuit Master, and that if not construed and limited in the light of the Sandin specification to substantially the structure shown in the drawings and described in the specification, the claims are invalid over the prior U. S. patent to Hodgkins No. 1,660,874, and the prior British patent to Holmes No. 17,888 of 1905.

### Hodgkins Patent No. 2,073,103

The Hodgkins patent No. 2,073,103 in suit discloses an automatic circuit breaker structure arranged in the form of the ordinary screw type fuse plug. The specification, page 1, col. 1, lines 6–9, states:

"It is an object of this invention to provide an automatic circuit breaker mechanism capable of being housed within a housing of approximately the size of an ordinary screw type fuse plug."

The circuit breaker structure disclosed in the drawings and specification of this Hodgkins patent has never been produced commercially. The only breaker claimed to have been made under it is the Multi-Breaker (Plaintiff's Exhibit 35) which bears no resemblance to the Hodgkins structure. In fact, the Multi-Breaker is made under the Jackson patent No. 2,096,546 (Defendant's Exhibit 580), which is not in suit and belongs to Square D Company, which covers it and which it very closely resembles.

The Hodgkins patent was involved in prior litigation in the case of Westinghouse Electric & Mfg. Co. v. Frank Adam Electric Co., decision unreported, in the U. S. District Court for the Eastern District of Missouri and was there held valid and infringed. However, the present record does not disclose the structure of the device involved in that case, nor the considerations which led to the holding of validity and infringement, other than that prior U. S. Patents to

De Reamer—No. 1,494,221
Weber—No. 743,207
Getchell—No. 1,708,222
Laganke—No. 1,789,183
Taylor—No. 2,018,904
Krantz—No. 1,726,233
Mayer—No. 1,887,274
German, to Felten—No. 198,246

are stated (Tr. 2589–90) to have been before and considered by the District Court in that case.

Claims 31, 32, 33, 41 and 44 of the Hodgkins patent No. 2,073,103 are charged to be infringed by Circuit Master, and claims 39 through 43 inclusive are charged to be infringed by Pushmatic.

Structurally, the Hodgkins patent device employs a rotatable handle 50 which is the cover of the breaker casing, a vertically slidable contact 20 which, through its carrier 22, is continuously urged to open position by one spring 30, and a train of mechanism interposed between the cover handle 50 and the movable contact 20 comprising a "floating bar" 46, a take-up and contact closing spring 44, a motion transmitting block 40, and a bimetallic element 48, one end of which is fixed to the breaker casing and the other end of which releasably latches or engages one end of the floating bar 46.

This train of mechanism 46–44–40–48 is essential to the operation of the Hodgkins breaker disclosed in the specification and drawings, and it is also essential in the Hodgkins structure that the "floating bar" 46 move relative to the handle and relative to the movable contact in all opening and closing and resetting operations of the breaker.

The Circuit Master and Pushmatic breakers differ very substantially in structure and parts and the arrangement thereof from the breaker construction shown in the drawings and described in the specification of the Hodgkins patent. It was testified by Professor Hoover, defendant's expert witness, in pointing out the differences in structure and operation between the devices of the Hodgkins patent and the Circuit Master and Pushmatic, that there is nothing in the drawings and specification of the Hodgkins patent that would teach how to design or construct the Circuit Master or the Pushmatic.

Neither Circuit Master nor Pushmatic employ Hodgkins' train of mechanism interposed between the handle and the movable contact for obtaining operation of the movable contact by the handle. They do not contain elements corresponding to the motion transmitting block 40 or the take-up and contact closing spring 44 of Hodgkins. Nor do Circuit Master and Pushmatic employ the "floating lever" or "floating bar" 46 of the Hodgkins patent.

Plaintiff contends that the switch arms of Circuit Master and Pushmatic correspond to Hodgkins' "floating lever" or "floating bar" 46. This, however, is not the case as in both Circuit Master and Pushmatic the switch arms carry the movable contacts rigidly fixed thereto and as a part of the switch arms. These switch arms cannot correspond to the Hodgkins floating bar 46 which must, as conceded by plaintiff, move relative to the Hodgkins movable contact 20 and its carrier 22 under all conditions of operation. The floating bar 46, is a mechanical element that is not present in the Circuit Master and Pushmatic constructions.

The claims of the Hodgkins patent No. 2,073,103 asserted to be infringed fall into two main groups. Claims 31, 32, 33 and 44 are directed to the circuit breaker mechanism per se without any claiming of combination between the mechanism and the breaker casing. Claims 39 through 43, inclusive, are directed to a combination of the breaker mechanism with the breaker casing and designate the breaker mechanism in substantially broader terms than the

claims above mentioned which are directed to the breaker mechanism per se.

However, each and every one of the claims in suit calls for the Hodgkins element 46, specifying it as a "floating actuating member" in claims 31, 32, 33 and 44, as a "floating bar" in claims 39 through 42, inclusive, and as a "movable bar" in claim 43. Neither Circuit Master nor Pushmatic employ Hodgkins' floating element 46 or any equivalent or counterpart of it. The switch arms of Circuit Master and Pushmatic which are the movable contact carriers in those devices, cannot be taken to correspond to the floating bar 46 of Hodgkins, as contended by plaintiff, for the reason that the floating bar 46 of Hodgkins is a mechanical element separate and distinct from and necessarily movable relative to the movable contact carrier 22.

Further, each of claims 39 and 40 contain the following specification:

"* * * said actuating means including a floating bar connected to one point to said movable contact, current responsive means in latching engagment with said floating bar at another point, means for biasing said floating bar to carry said movable contact to open circuit position when released by said current responsive means, * * *."

This refers in the Hodgkins device to the floating bar 46 connected at its mid-point 42 to the motion transmitting block 40 which in turn is connected to the movable contact carrier 22, and then to the latching engagement of the bar 46 with the bimetal 48 at the point 46s and to the spring 30 which biases the contact carrier 22, block 40, bar 46 upwardly to open the contacts when the latching engagement between the bimetal 48 and the bar 46 at the point 46s is released.

These claims are asserted to be infringed by Pushmatic only. The quoted language of the claims specifies that the floating bar be connected at one point to the movable contact and that it be in latching engagement with the current responsive or bimetal element at another or different point. Plaintiff contends that Pushmatic responds to the quoted terms of the claims if the first point or point of connection of the floating bar to the movable contact be taken in Pushmatic as the point at which the movable contact is rigidly welded or fixed to the switch arm, and if the point of latching engagement of the floating bar with the current responsive means or bimetal element be taken in Pushmatic as the point at which the bimetal member is rigidly fixed to the Pushmatic switch arm. This contention is untenable for in Pushmatic the current responsive means or bimetal has no latching engagement whatever with the switch arm which plaintiff contends is Pushmatic's floating bar; and the connection between Pushmatic's switch arm and the movable contact, being a rigid and fixed connection, is wholly unlike the connection between the "floating bar" and "movable contact" contemplated in the claim when read in the light of the Hodgkins specification, for that connection in Hodgkins between the floating bar 46 and the movable contact carrier 22 is necessarily a movable or pivotal connection and totally unlike the rigid connection between the Pushmatic movable contact and its switch arm which are, in reality, only one integral part.

Claim 41, asserted to be infringed by both Circuit Master and Pushmatic, and claim 42, asserted to be infringed only by Pushmatic, each have the following specification:

"* * * said actuating means including a floating bar connected at one point to said movable contact, a current responsive latch normally holding said floating bar at another point, biasing means for causing said floating bar to carry said movable contact to open-circuit position when released by said current responsive latch, * * *."

This specification, in slightly different wording, is the same as that above referred to in claims 39 and 40 and is not found in Pushmatic for the same reasons above stated with respect to claims 39 and 40. It is not found in Circuit Master for the same reasons, as the Circuit Master movable contact switch arm and bimetal are substan-

tially identical in construction and operation with that of Pushmatic. The movable contact is welded and rigidly fixed and a part of the switch arm in Circuit Master and the bimetal is rigidly fixed to the switch arm and has no latching engagement with the switch arm, which plaintiff contends should be taken as the floating bar of the claim.

Not only the construction but the arrangement and organization of parts in Circuit Master and Pushmatic are entirely different in this respect from that of the Hodgkins device. Where in Hodgkins the bimetal element is secured to the breaker casing, and the floating bar is pivotally movable relative to and releasably latches to the bimetal element, and is also pivotally movable relative to the movable contact and its carrier, in Circuit Master and Pushmatic the movable contact carrier or switch arm and the movable contact are welded together as one integral part and the bimetal is rigidly secured to the contact carrier or switch arm and has no latching engagement whatever with the movable contact carrier or switch arm, but has its latching engagement with the handle in Circuit Master and with a separate plate in Pushmatic. There is no similarity of construction or arrangement of the parts between the Hodgkins device on one hand and the Circuit Master and Pushmatic on the other hand, nor is there any suggestion in the Hodgkins specification and drawings of the construction and arrangement used in Circuit Master and Pushmatic.

Claim 43 asserted to be infringed by Pushmatic only, contains the following specification:

"* * * a current responsive latch normally holding one point of said actuating means, a spring for moving said movable contact to open-circuit position upon the release of the actuating means by said current responsive latch, * * *."

This specification is also, in slightly different wording, the same as that above referred to in claims 39, 40, 41 and 42, and is not found in Pushmatic for these reasons

stated with respect to those claims. That is to say, the current responsive latch referred to in the claim is the bimetal 48 of Hodgkins which normally holds one point 46s of Hodgkins actuating means, which is the bar 46. The term "normally holding," construed in the light of the Hodgkins specification, means releasably holding. In Pushmatic there is no such latching between the bimetal and the switch arm as there is in Hodgkins between the bimetal 48 and the bar 46.

It is therefore held that the claims of the Hodgkins Patent No. 2,073,103, construed in the light of the Hodgkins specification, are not infringed by either the Circuit Master or the Pushmatic.

Claims 31, 32, 33 and 44, unless construed in the light of the Hodgkins specification and given the meaning intended when applied to the Hodgkins construction, are as well applicable to describe the circuit breaker structure disclosed in the prior patent to Krantz No. 1,726,233, dated August 27, 1929, also a Westinghouse patent, as they are to describe Circuit Master. This is demonstrated in the testimony given at the trial.

It was also demonstrated in the testimony given at the trial that claims 31, 32 and 33, unless construed in the light of the Hodgkins specification and given the meaning intended when applied to the Hodgkins device, can be read as well to describe the circuit breaker disclosed in the prior German patent No. 198,246, dated May 4, 1908, as they can to describe Circuit Master.

Claims 39 through 43, inclusive, which are the claims directed to the combination of the circuit breaker mechanism broadly specified with the insulating circuit breaker casing for guiding and supporting and providing a frame for the actuating means of the circuit breaker during movement, unless considered and contrued in the light of the Hodgkins specification and given the meaning intended when applied to the Hodgkins device, are as applicable to describe the circuit breaker disclosed in the prior patent to Laganke No. 1,789,183, dated January 13, 1931, as they are to describe either the Circuit Master or the

Pushmatic. This is demonstrated in the testimony given at the trial.

None of these prior patents, Krantz No. 1,726,233, German Patent No. 198,246, Laganke No. 1,789,183, were considered by the Patent Office in allowing the claims of the Hodgkins Patent.

Those calls of claims 39 through 43, inclusive, which describe the breaker mechanism as distinguished from the casing of the breaker, are fully answered and met by the circuit breaker disclosed in the prior patent to Getchell No. 1,886,477, dated November 8, 1932, application filed March 23, 1931, prior to any date claimed for the Hodgkins patent in suit No. 2,073,103, and this is demonstrated in the testimony given at the trial.

Those calls of claims 39 through 43, inclusive, which describe the insulating casing are also broadly and generally stated:

Claims 39 and 40: "In a circuit breaker, a casing of insulating material, * * *, said actuating means being supported and guided during movement by the insulating material of the casing, * * *."

Claims 41 and 42: "In a circuit breaker, a casing of insulating material, * * *, said casing of insulating material forming the frame of the circuit breaker and supporting and guiding the actuating means during its movement, * * *."

Claim 43: "In a circuit breaker, a casing of insulating material, * * *, said casing of insulating material forming the frames of the circuit breaker and having means therein for guiding the movement of said slidable member, * * *."

It is apparent, as well as conceded by plaintiff, that neither the Circuit Master nor the Pushmatic mechanisms could use the breaker casing disclosed in the Hodgkins drawings and specification for mounting or supporting and guiding or forming the frame for either the Circuit Master or the Pushmatic breaker mechanisms. And it is also apparent that the Hodgkins drawings and specifications could provide no aid or teaching for the design and con-

struction of the Circuit Master and Pushmatic casings that was not already available in the prior art noted below, i. e., the suggestion and teaching that insulating casings can be designed to serve as frames for and to support and guide the parts of the breaker mechanism in operation.

It is demonstrated in the art prior to the Hodgkins patent in suit, represented by the prior U. S. Patent to Weber No. 743,207, dated November 3, 1903, for Incandescent Electric Lamp Socket (containing a switch), and prior patent to Aichele No. 1,732,295, dated October 22, 1929, for a Circuit Interrupter (an automatic overload circuit breaker), that the idea of using the insulating casing for a switch or circuit breaker to support and guide the switch or breaker mechanism in operation and to provide a frame therefor was old and known. In the Weber patent the insulating casing is clearly disclosed as providing the support and guide for the operating parts of the switch and the frame therefor. This is also clearly shown in the Aichele patent Figures 16, 17, 19 and 20. Other prior patents disclosing the same idea applied to various forms and arrangements of switch mechanisms are DeReamer No. 1,494,221, dated May 13, 1924; Ellis No. 1,860,999, dated May 31, 1932; Gaynor No. 1,969,263, dated August 7, 1934, application filed October 30, 1929. So that at the time of the invention of the Hodgkins patent in suit, if one wished to use the insulating casing as a frame and for supporting and guiding in operation the mechanism of a switch or circuit breaker, no more than ordinary mechanical skill was required to design the breaker casing to suit and to fit the switch or breaker mechanism.

These claims 39 through 43, inclusive (which were claims 48-52 of the application) were added to the Hodgkins application by an amendment made late in its prosecution before the Patent Office, and were allowed by the Patent Office without comment and without noting the prior Weber patent. The prior Aichele patent had been noted earlier in the prosecution of the application in the first Office Action to show equivalence of bimetallic and electro magnetic overload release mechanisms,

but was not again referred to nor was it noted with reference to these claims 39 through 43, inclusive. Nor were the prior patents to DeReamer, Ellis, and Gaynor considered by the patent office in granting these claims.

Thus these claims 39 through 43, inclusive, have the effect of affording patent protection to circuit breaker mechanism unpatentable and in the prior art merely by claiming it in connection with a casing of insulating material designed to support and guide and provide a frame for the unpatentable mechanism, where the prior art unnoted by the Patent Office in allowing the claims, had clearly disclosed the use of the insulating casings to support and guide and provide frames for operating mechanisms of switches and circuit breakers of a variety of forms and constructions, and where at and prior to the Hodgkins patent the concept of using the insulating casing for such purpose was old and known and it had become a matter of ordinary mechanical designing to fashion insulating casings to support and guide and provide the frames for switch and breaker mechanisms.

It is held that the claims of the Hodgkins patent No. 2,073,103 asserted to be infringed are to be construed in the light of the drawings and specification of the patent and that when so construed and given the meaning intended when the claims are applied to the Hodgkins device, they are not infringed by either the Circuit Master or the Pushmatic.

It is further held that if construed broadly as contended for by plaintiff in order to reach Circuit Master or Pushmatic, that claims 31, 32, 33 and 44 are invalid for including the structure of the prior patent to Krantz No. 1,726,233, and that claims 31, 32 and 33 are invalid for including the structure of the prior German Patent No. 198,246, and that claims 39 through 43, inclusive, are invalid for including the structure of the prior patent to Laganke, patent No. 1,789,183.

It is further held that claims 39 through 43, inclusive, directed to the combination of the circuit breaker mechanism and the casing thereof as a frame for supporting and guiding the actuating mechanism are invalid for want of patentable invention in view of the prior art represented by the prior patent to Laganke No. 1,789,183, the prior patent to Getchell No. 1,886,477, the prior patent to Weber No. 743,207, and the prior patent to Aichele No. 1,732,295, and also the prior patents to DeReamer No. 1,494,221, Ellis No. 1,860,999, and Gaynor No. 1,969,263.

### Jennings Patent No. 2,190,517

Jennings Patent No. 2,190,517 in suit discloses a circuit breaker structure very substantially different from that of either Circuit Master or Pushmatic charged to infringe it.

None of the claims of the patent which are directed to the circuit breaker mechanism alone are asserted to be infringed.

Infringement is claimed only of those claims, variously worded, which are directed to the combination of an overload trip-free breaker with an open sided casing provided with means for receiving and positioning the parts of the breaker mechanism, and a flat casing cover for retaining the parts in place.

The patent was held valid, but not infringed, in a prior suit, Westinghouse Electric & Manufacturing Co. v. Frank Adam Electric Co., in the United States District Court for the Eastern District of Missouri.

However, the decision in that case is unreported, the considerations upon which it is based do not appear, other than that prior U. S. Patents to—

De Reamer—No. 1,494,221
Weber—No. 743,207
Getchell—No. 1,708,222
Laganke—No. 1,789,183
Taylor—No. 2,018,904
Krantz—No. 1,726,233
Mayer—No. 1,887,274
German, to Felten—No. 198,246

are stated (Tr. 2589–90) to have been before and considered by the District Court in that case.

The circuit breaker mechanism and structure disclosed in the Jennings specification and drawing has never been produced commercially.

Plaintiff claims that its Quicklag breaker (Plaintiff's Exhibit 38) is made under this patent. The circuit breaker mechanism of the Quicklag structure is substantially different from the mechanism disclosed in the patent and is covered by other patents of plaintiff not involved in this suit. However, the Quicklag is provided with an open sided casing that receives and positions the parts of the breaker mechanism, and with a flat sided cover which retains the parts in the casing.

The Jennings patent discloses two forms of circuit breaker structure, one form in Figs. 1 to 3, and another in Figs. 4 and 5 of the drawings. The principal difference between them is that the form shown in Figs. 1 to 3 is provided with a casing divided into a top part and a bottom part, the plane of division being at a right angle to the major plane of the case and to the plane in which the parts move, while the form in Figs. 4 and 5 has a casing with a flat cover, the plane of division between the casing and cover being parallel to the major plane of the case and the plane in which the parts move.

The claims of the patent asserted to be infringed are all based on the form shown in Figs. 4 and 5 of the patent.

Claims 15, 19, 21, 27, 31 and 35 are asserted against Circuit Master only.

Claims 22, 25, 28, 29 and 30 are asserted against Pushmatic only.

Claims 20, 23, 32, 33 and 34 are asserted against both Circuit Master and Pushmatic.

The circuit breaker of the Jennings patent (Figs. 4 and 5) employs a handle 97–109, a switch arm 17 pivotally mounted separately from the handle carrying the movable contact 43 and the bimetal 21, and actuator member 49 mounted on the same pivot with the switch arm 17 and to which the bimetal 21 latches. An over-center spring 99 is interposed between the separately pivoted handle 97–109 and the actuator 49. A second spring 65 is interposed between the casing and switch arm 17 and continuously urges arm 17 to the open position. Over-center spring 99 acts, in response to movements of the handle 97–

109 between the open and closed positions, to move actuator 49 between open and closed positions, with a snap action. When actuator 49 is snapped to the closed position, it is able, because of the connection at 61 to the bimetal 21, to carry the switch arm to closed position, against the force of spring 65. When handle 97–109 is moved to the open position, spring 99 snaps actuator 49 to the open position. This relieves the pressure of the actuator 61 against the bimetal 21 at point 61, and enables spring 65 to move switch arm 17 to the open position. Under overload conditions, the end of bimetal 21 warps away from the actuator 49 and releases the latching connection at 61. This enables spring 65 to move switch arm 17 to the open position, without a corresponding movement of actuator 49.

The Jennings casing (Figs. 4 and 5) is provided with a stud or pin 101 to slidably receive and position the switch arm 17, actuator 49 and second spring 65 and with a second stud or pin 103 to slidably receive and position the separately pivoted handle 97–109, and with notches or slots 105 in the end walls, one of which receives the input terminal 11 to which the fixed contact 15 is secured, and the other of which receives the output terminal 13. A flat cover 119 is provided for the open side of the casing to retain the switch arm 17, actuator 49, handle 97–109 and springs 99 and 65 in the case, and is secured to the casing by bolts.

The Circuit Master (Plaintiff's Exhibits 26, 26a and 27) employs a handle B, a switch arm C carrying a movable contact E welded thereto and bimetal D riveted thereto which is mounted within the handle and pivots as a unit with the handle in manual operation, and a single spring G. interposed between the casing and the switch arm C for moving the switch arm to open and closed circuit position. Circuit Master has no actuator element such as Jennings' actuator 49 latching to the switch arm, no spring such as Jennings' spring 99 interposed between handle and actuator. The Circuit Master casing is open sided and has a recess for receiving one end of the pivot boss $B^1$ on the handle. It has no

separate pins or studs such as Jennings' pins and studs 101 and 103 for receiving and separately mounting the handle and the switch arm. The Circuit Master case has slots in its end walls for receiving the input and output terminals, and a flat cover which has a recess for receiving the other end of the boss $B^1$ on the handle B and is secured to the case by rivets.

The Pushmatic (Plaintiff's Exhibits 32, 32a and 33) employs a slidable or push handle B, a sliding insulating plate $B^2$ upon which the unit, consisting of a switch arm C carrying the movable contact E brazed thereon and the bimetal D brazed thereto, is pivotally mounted by Pin T which is part of the switch arm unit, and a spring G interposed between the case and the switch arm for moving the switch arm to open and closed circuit positions. Pushmatic has no separately pivoted handle such as Jennings' handle 97–109, no spring interposed between handle and switch arm such as Jennings' spring 99. The Pushmatic casing is open sided but has no pins or studs such as Jennings' pins 101 and 109 for receiving and positioning and pivotally mounting the handle and the switch arm. The Pushmatic casing has slots in its back wall for receiving the input and output terminals, however, the input terminal carrying the fixed contact is locked in the casing and is not retained therein by the casing cover. A flat cover is provided for the casing and is held in place by bending lugs on the cover over projections on the casing.

Prior patent to Laganke No. 2,025,872, dated December 31, 1935, on application filed January 2, 1934, prior to any date of invention claimed for the Jennings Patent No. 2,190,517, discloses an automatic overload trip-free circuit breaker housed within an open sided casing 11 provided with a flat cover 74 and with a pin or stud 24 projecting inwardly from the back wall of the casing. The pin 24 slidably receives and mounts and positions for operation the handle 26, bimetal 39, blade holder 23 which carries the copper switch blade or arm 18 to which is fixedly secured the movable contact 20. An over center spring 30 is interposed between the casing and a part 29 of the handle 26 for moving the switch arm to open and closed positions in manual operation, and a second spring 34 engaging the blade holder 23 and the switch blade or arm 18 is provided to move the switch arm 18 to open circuit position on overload operation when the switch arm is released from its latched engagement with the bimetal 39. Laganke inserts a conventional removable cotter pin 33 through the end of the mounting pin 24 to retain the parts above-mentioned on the pin 24, although the flat cover 74 could be used for that purpose as demonstrated in the testimony given at the trial. The casing of Laganke is provided at one end with a slot to receive the output terminal lead as shown in Fig. 3, and also as shown in Fig. 3 with slots extending upwardly from the bottom of the casing into which the bus bar 14 and 15, which are the input leads, are inserted.

Thus the Laganke Patent No. 2,025,872 discloses an overload trip-free breaker with an open sided casing provided with a pin or stud for receiving and positioning the parts of the breaker mechanism, an arrangement substantially similar to that of the Jennings patent in suit. However, Laganke used a cotter pin through the end of his mounting pin to retain the breaker parts in place on the mounting pin, although the flat casing cover could have been used for that purpose; Jennings dispensed with the cotter pin and relied on the flat casing cover.

Other prior patents:

Weber No. 743,207, dated November 3, 1903;

DeReamer No. 1,494,221, dated May 13, 1924;

Ellis No. 1,860,999, dated May 31, 1932;

Gaynor No. 1,969,263, dated August 7, 1934;

Aichele No. 1,732,295, dated October 22, 1929;

Hodgkins patent in suit No. 2,073,103, dated March 9, 1937 on application filed August 4, 1933;

clearly disclose the idea and its practice in a variety of ways and forms of using the insulating casing as a frame to receive and support and position for opera-

tion the parts of the breaker mechanism, and the use of the casing cover to retain the parts in the casing.

The prior patent to Ellis, above mentioned, for example, discloses a thermostatic switch and plug construction having an open sided insulating case 10 provided with recesses and partitions to receive and position for operation the operating parts of the switch and the terminals and a flat cover 11 secured to the open side of the casing by screws for retaining the switch parts in the casing. This patent states, page 1, col. 1, lines 7–9,

"One object is to provide a construction that may be removed from the casing, or quickly assembled therein."

None of the prior patents above mentioned were considered by the Patent Office in granting the Jennings Patent No. 2,190,517 in suit (Patent Office File Wrapper Jennings Patent No. 2,190,517, Defendant's Exhibit 561).

During the prosecution in the Patent Office of the application for the Jennings Patent No. 2,190,517, the attorneys for Jennings noted the grant of United States Patent No. 2,130,369 to Christensen (Defendant's Exhibit 558) on application filed September 9, 1937, which was subsequent to the filing date of the Jennings application on December 17, 1936. Jennings' attorneys then attempted to present claims in the Jennings application copied from the Christensen patent. This was denied by the Patent Office, whereupon claims were presented in the Jennings application, which together with Claim 18 already in the Jennings application, were asserted to "dominate," that is to read upon and describe, the structure disclosed in the Christensen patent. These claims in the Jennings application were, No. 18 already in the application, and Nos. 31, 32, 33, 34, 35, and 39 through 42, inclusive, added as new claims and are now claims 15, 19, 20, 21, 22, 23, 27, 28, 29 and 30 of the Jennings patent, and are asserted to be infringed by defendant's Circuit Master and Pushmatic breakers.

No interference proceedings were had in the Patent Office to determine priority of invention between Jennings and Christensen, as the Christensen patent had issued prior to the time attention was directed to it in the Jennings application, and Jennings was denied the right to copy any of the claims appearing in the issued Christensen patent, (Patent Office File Wrapper of Jennings Patent No. 2,190,517, Defendant's Exhibit 561).

The matter becomes of importance here because of the assertion on behalf of Jennings in the prosecution of his application that the claims above referred to "dominate" or cover and describe the structure shown in the Christensen patent, and defendant has produced evidence in this case which it claims proves that the breaker disclosed in the Christensen patent was actually invented prior to the invention by Jennings of the breaker disclosed in the patent in suit and thereby renders invalid the Jennings claims above designated.

The Christensen breaker shown in the Christensen patent discloses an overload trip-free circuit breaker having a two part insulating casing divided in the major plane of the casing and in a plane parallel with the direction of movement of the movable contact member. The Christensen casing is composed of two identical but opposed parts provided with recesses and walls adapted to receive and support the breaker mechanism and terminals in operative relation and position. The frame which the Christensen casing provides is necessary to the support of the breaker mechanism in operative position, and, in assembly, the breaker mechanism is simply laid in one part of the casing and secured therein by laying the other part of the casing over the mechanism and securing it to the first casing part by bolts. It is true that the details of construction of the breaker mechanism and casing of Christensen differ from those of Jennings, however, the idea and advantages regarded by Jennings as important, i.e., the provision of an open sided casing provided with means for receiving and positioning the parts of the breaker mechanism and a cover for retaining the breaker parts in place in the casing, and joining the casing in a plane parallel to the plane of movement of the

movable contact, and case of assembly and disassembly for adjustment, repair and replacement purposes, are identical in all substantial respects.

With respect to priority of invention as between Christensen and Jennings, it is established by the evidence (Christensen's deposition and Christensen's deposition Exhibits 1 to 31, inc., Defendant's Exhibits 560 and 560A; and the Jennings stipulated depositions and exhibits referred to therein, identified as Plaintiff's Exhibits 65 through 71, and 65A through 71A, inc.), that Christensen, working in the Electrical Division of Colts Patent Firearms Company at Hartford, Connecticut, first made a drawing of the device on December 14, 1935, from which a full sized working model was made and completed on January 2, 1936, that a second drawing was made on February 10, 1936, and a second working model made from such drawing was completed on February 17, 1936. These two models (Christensen deposition Exhibits 29 and 30) were subjected to a series of tests during the period from January 2, 1936, to July 14, 1936, when it was decided, and the decision recorded (Christensen deposition Exhibit 31), that the breaker was satisfactory and ready for the making of production drawings and tools. Instructions had been given in February, 1936, to Colts' patent attorney to file application for patent on the device. However, that was not done until September 9, 1937, due to other work with which the attorney was occupied.

The Christensen breaker was not put on the market, other development work intervening subsequent to the completion of the testing of the breaker. However, the Christensen device was fully tested and demonstrated to operate successfully in the testing operations occurring in the period from January 2, 1936, to July 14, 1936, and the invention was not abandoned as subsequently patent application was filed and patent obtained upon it.

Jennings made sketches in November, 1935, Plaintiff's Exhibits 65–70 and 65A–70A, inclusive, of which 65–65A do not disclose any casing structure and 70–70A show only a top opening casing structure such as the form shown in Figs. 1 to 3 of the drawings in the Jennings patent and which is not the "open-sided casing" described by the claims in suit.

Jennings' sketches, Plaintiff's Exhibits 66–69 and 66A–69A show open-sided casings, but do not disclose how the breaker parts were to be mounted or held in the casings. These sketches are as consistent with the idea of holding the breaker parts in the casing by a cotter pin as in the prior Laganke Patent No. 2,025,872, or by riveting the parts in place to the casing as in the prior patent to Taylor No. 2,018,904, as they are with the idea of holding the parts in place only by the cover as in Figs. 4 and 5 of the Jennings Patent No. 2,190,517 in suit.

The first suggestion by Jennings of the open-sided casing adapted to receive and position the operating parts of the breaker, or of using the cover to retain them in place is in the disclosure by Jennings to the Westinghouse Patent Department of June 5, 1936. No such construction was ever made or tested by Jennings or Westinghouse prior to the filing of the application of Jennings Patent No. 2,190,517 in suit, on December 17, 1936.

It is held that Christensen actually made the complete invention shown in Patent No. 2,130,369 by conception, by drawings disclosing it made December 14, 1935, and February 10, 1936, and models made according to those drawings on January 2, 1936, and February 17, 1936 and reduced the invention to practice by actually constructing breakers (Christensen deposition Exhibits 29 and 30) that successfully operated according to the conception during the period from January 2 to July 14, 1936; that the invention was never abandoned as application for patent on it was ordered in February, 1936, and filed September 9, 1937, and resulted in the U. S. patent disclosing it, No. 2,130,369; and that the Christensen invention is prior to that of Jennings shown in Figs. 4 and 5 of the Jennings Patent No. 2,190,517 which is not shown by any corroborated evidence to have been conceived prior to June 5, 1936, and which was never actually constructed

or reduced to practice until after the successful construction and reduction to practice of the Christensen device.

Considered in the light of the specification and drawings of the Jennings Patent No. 2,190,517, and of the prior art, neither Circuit Master nor Pushmatic respond to the claims asserted against them.

Claims 15, 27 and 35 asserted against Circuit Master only specify:

"* * * an open-sided casing * * * said casing being provided with means for slidably receiving said above mentioned parts * * *."

Claim 23 asserted against both Circuit Master and Pushmatic specifies:

"* * * an insulating housing enclosing all of the aforesaid parts * * *, at least one of the said parts of the housing having means for slidably receiving said movable contact member, said operating member and said mechanism, * * *."

Claim 30 asserted against Pushmatic only specifies:

"* * * an open-sided casing of insulating material, * * * one of said casing members having means for slidably receiving said movable switch member and said operating means * * *."

The "means for slidably receiving" refers to the pins 101 and 103 in the Jennings case, Fig. 4, and the "above mentioned parts" specified in Claims 15, 27 and 35, and said "movable contact member" specified in Claims 23 and 30 refer to and include the switch arm 17 of the Jennings construction which is slidably received and pivotally mounted on pin 101. Considering that in Circuit Master there are no pins in the casing for slidably receiving the switch arm, that the switch arm is mounted in and carried by the handle, and that the handle is pivoted with a boss B¹ on each side, one of which is received in a recess in the case, and the other of which is received in a recess in the cover, and that the handle B is not supported for operation by the recess for the handle boss B¹ in the case but depends upon the opposite boss B¹ being also supported by the cover and the cover being secured to the case, as in the prior patent to Gaynor No. 1,969,263, Fig. 5 (Defendant's Exhibit 557), and as in the prior device of Christensen (Christensen Deposition Exhibits 29 and 30, Tested Breaker Models, shown in Christensen Patent No. 2,130,369, Fig. 6, Defendant's Exhibit 558); the Circuit Master does not respond to the construction that must be given these claims in view of the Jennings specification and drawings and the prior art.

Pushmatic, which is wholly unlike the Jennings breaker in construction and arrangement of breaker mechanism, and arrangement of case, has no pins or studs in the casing corresponding to Jennings' "means" for slidably receiving the switch arm or any other parts. And in the casing of Pushmatic the parts are "laid" not "slid" in assembly. Pushmatic takes nothing of teaching or aid in construction from the Jennings specification and drawings that was not available in the prior art represented by Ellis No. 1,860,999, Defendant's Exhibit 556; Gaynor No. 1,969,263, Defendant's Exhibit 557; DeReamer No. 1,494,221, Defendant's Exhibit 555, Aichele No. 1,732,295, Defendant's Exhibit 545; Christensen Deposition Exhibits 29 and 30, Tested Models, illustrated in Christensen Patent No. 2,130,369, Defendant's Exhibit 558.

Pushmatic does not respond to the construction that must be given these claims in view of the Jennings specification and drawings and the prior art.

Claim 19 asserted against Circuit Master only, specifies, lines 51–59:

"* * * and a two piece insulating housing enclosing all of the aforesaid parts other than the manually engageable portion of the operating member * * *, the said housing having means for fixing the path of movement of the contact member and for pivotally supporting the operating member * * *."

The clause "means for fixing the path of movement of the contact member and for pivotally supporting the operating member" in the claim has reference, when applied to the Jennings specification and

drawings, to the pin 101 upon which the switch arm 17 is pivotally mounted and to the other pin 103 upon which the handle or operating member 97–109 is pivotally mounted.

In Circuit Master the housing has no means for pivotally mounting the switch arm which is carried in the handle B, and it therefore lacks that "means" required by the claim when applied to the Jennings specification. Jennings neither teaches nor suggests that the "means" pin 101 for supporting and fixing the path of movement of the switch arm 17, which is separate and independent of the pivot pin 103 which supports the handle 97–109, can be eliminated or dispensed with, nor how the switch arm can be mounted on or carried by the handle. That sort of arrangement of parts is suggested in the prior patent to Laganke No. 2,025,872 (Defendant's Exhibit 551) and the prior patent to Gaynor No. 1,969,263 (Defendant's Exhibit 557), which Circuit Master resembles rather than Jennings in that respect.

Circuit Master does not use the construction that must be given Claim 19 in view of the Jennings specification and prior art.

Claim 20, asserted against both Circuit Master and Pushmatic, specifies, page 7, col. 2, lines 2–11:

"* * * and a housing enclosing all of the aforesaid parts other than the manually engageable portion of the operating member * * *, the said housing having a plurality of means each serving as the supporting and movement defining means for one of the aforesaid parts * * *."

The "aforesaid parts" include the switch arm 17 of Jennings, and among the "plurality of means each serving as the supporting and movement defining means, etc." is the pin 101 of Jennings which serves to support and define the movement of the switch arm 17 separately from the "means" pin 103 that supports and defines the movement of Jennings' operating member or handle 97–109.

Circuit Master has no "means" such as Jennings' pin 101 for supporting and defin-

ing the movement of the switch arm separately from the handle B and so lacks that element of the claim which is essential to the construction and operation of Jennings. Circuit Master, in organization of handle and switch arm bears resemblance to the prior patents to Laganke No. 2,025, 872 and Gaynor No. 1,969,263 rather than to Jennings.

Pushmatic is clearly different and takes nothing from Jennings not already available in the prior art as stated above in connection with Claims 15, 23, 27, 30 and 35.

Neither Circuit Master nor Pushmatic use or respond to the construction that must be given to Claim 20 in view of Jennings specification and the prior art.

Claim 21 asserted against Circuit Master only specifies, lines 27–38:

"* * * and an insulating housing enclosing all of the aforesaid parts other that the manually engageable portion of the operating member * *, at least one of said insulating housing members serving as the frame of the circuit breaker and having means movably supporting the movable contact member and the pivot of the operating member * * *."

This claim, like Claim 19, refers in the Jennings specification and drawings to the pin 101 as the "means movably supporting the movable contact member," i. e., switch arm 17 and to the pin 103 as the "means movably supporting * * * the pivot of the operating member."

For the same reasons mentioned with respect to claim 19, Circuit Master does not respond to or use the construction that must be given to Claim 21 in view of Jennings' specification and the prior art.

Claim 22 asserted only against Pushmatic specifies, lines 55–65:

"* * * and an insulating housing enclosing all of the aforesaid parts other than the manually engageable portion of the operating member and comprising two members of insulating material * * *, and at least one of said insulating members serving as at least part of an insulating frame individually supporting the movable con-

tact member and the operating member without being positively fastened thereto."

This refers to the insulating casing part 95 of the Jennings' specification and drawings which has the pin 101 for supporting the movable contact member or switch arm 17, and the pin 103 for supporting separately from the switch arm the handle or operating member 97–109.

In Pushmatic the casing does not "individually support" the movable contact or switch arm as in Jennings. In Pushmatic the switch arm is supported on the slidable plate. Jennings' specification and drawings teach nothing of the switch arm construction and its support by the slidable plate used in Pushmatic. The indefinite and functional statements of the claim will better describe the prior patent to Laganke No. 2,025,872 where the insulating housing 11 has the pin 24 supporting the movable contact member 18 and also the operating member or handle 26; or the prior patent to Ellis No. 1,860,999 where the insulating housing 10 individually supports the movable contact piece 30 and its bimetal arm 24, and the operating member 41–41 [1] without being positively fastened thereto.

Pushmatic takes nothing from the Jennings patent not already available in the prior art and does not respond to or use the construction that must be given Claim 22 in view of Jennings' specification and the prior art.

Claim 25 asserted only against Pushmatic specifies, page 8, col. 1, line 67—col. 2, line 6:

" * * * a two-piece insulating housing enclosing etc. * * *, and at least one of said pieces of the housing serving as at least part of an insulating frame and having means for receiving the connected unit including said movable contact carrying member, said actuating member, said bimetallic member and the terminal member connected thereto by the flexible shunt, * * *."

This refers in Jennings' specification and drawings to the housing part 95 having means pin 101 and slot 105 for receiving the connected unit switch arm 17—actuating member 49—bimetal 21—terminal 13 connected to bimetal 21 by flexible shunt 63.

The Pushmatic connected unit is switch arm—bimetal—flexible shunt—terminal. It does not include any actuating member as does the connected unit of Jennings. If the slidable plate of Pushmatic is considered an actuating member, it is not part of a connected unit, and must be put into the case separately from the switch arm and bimetal. In assembling Pushmatic the output terminal is first inserted in the slot in the back of the case, the separate slidable plate is then laid in the case, and the switch arm and bimetal are then laid in over the separate slidable plate. Pushmatic has no means such as the pin 101 in Jennings' case 95 for receiving the switch arm and actuating member.

Pushmatic takes nothing from the specification and drawings of the Jennings patent and does not respond or use the construction of Claim 25 when given the meaning intended in the Jennings drawings and specification.

Claim 28 asserted only against Pushmatic specifies, page 8, col. 2, line 62 * * Line 71—page 9, col. 1, lines 3–7:

" * * * an open-sided casing member, a contact, * * * a second casing member * * * said casing members being separable from each other etc. * * *, and at least one of them (casing members) serving as an insulating frame having separate means for retaining said contact, said switch member and said handle without being securely fastened thereto."

In the Jennings' specification and drawings "a contact" refers to the fixed contact 15, "and at least one of them (casing members) * * * having separate means for retaining said contact, said switch member and said handle without being securely fastened thereto," refers to Jennings' case part 95 having separate "means," slot 105 for retaining fixed contact 15, pin 101 for retaining switch arm 17, pin 103 for retaining handle 97–109, without being securely fastened thereto.

In Pushmatic the fixed contact F (Plaintiff's Exhibit 32a, 33) is received in a slot through the back of the case and is locked therein, so it is not retained in the case "without being securely fastened thereto" as required by the claim.

Pushmatic case has no separate "means" such as Jennings' pins 101 and 103 for retaining the switch arm and handle; the Pushmatic switch member is carried by a slidable plate and is not retained by pin means in the casing as in Jennings, and the handle is slidably mounted in a recess in the casing which will not retain it except when the cover is secured on the casing. Neither the method nor the means used by Pushmatic is disclosed or suggested by Jennings' specification and drawings.

Pushmatic does not use or respond to the construction of the claim when given the meaning intended in the Jennings specification and drawings.

Claim 29 asserted only against Pushmatic, except for immaterial variation in wording, makes the same specification as Claim 28, and for the same reasons as stated with respect to Claim 28 Pushmatic does not respond to or use the construction of the claim when given the meaning intended in the Jennings specification and drawings.

Claim 31 asserted only against Circuit Master specifies, page 9, col. 1, line 66 * * * col. 2, line 12 * * * lines 21–25:

"* * * an open sided casing member, * * * a second casing member * * *, and at least one of said casing members acting as an insulating frame for the circuit breaker and supporting at least all of the aforesaid parts other than said terminal strips in operative relation without being separately fastened thereto."

In Jennings' specification and drawings "at least one of said casing members" refers to Jennings' case part 95, and "supporting at least all of the aforesaid parts * * in operative relation without being separately fastened thereto" refers to switch arm 17, bimetal 21 and actuating member 49 supported on the casing pin 101, and

handle 97–109 separately supported on the case pin 103.

In Circuit Master the switch arm C and bimetal D are supported in the handle B and not by the casing separately from the handle as in Jennings and the recess in the Circuit Master case for the handle pivot boss $B^1$ will not support handle B in operative relation without the cover having the hole for receiving the opposite boss $B^1$, as the pins 101 and 103 of Jennings support the handle and switch arm in operative relation without the cover. In this respect Circuit Master resembles the prior patent to Gaynor No. 1,969,263, Figs. 1, 5, and 7 (Defendant's Exhibit 557) rather than Jennings.

Circuit Master does not respond to or use the construction of Claim 31 when given the meaning intended in the Jennings specification and drawings and construed in view of the prior art.

Claim 32 asserted against both Circuit Master and Pushmatic specifies:

"* * * an open-sided casing, a contact, a * * * switch member, operating means for moving said switch member, * * *, a trip device * * *, terminals * * *, said casing being provided with means for slidably receiving at least a majority of the above-mentioned parts through the open side of said casing, and a closure member having a substantially plane surface on one side engaging said open sided casing * * *, said closure member being the only means for securing a majority of the aforesaid parts in position with said means for slidably receiving them in the open sided casing."

In Jennings the "open-sided casing" refers to casing 95, "a contact" refers to fixed contact 15, "switch member" refers to switch arm 17, "operating means" refers to handle 97–109 and actuating member 49, "a trip device" refers to bimetal 21 and second spring 65, "terminals" refers to input terminal 11 and output terminal 13, "casing being provided with means for slidably receiving" refers to casing part 95 provided with pins 101 and 103 and

slots 105, "a majority of the above-mentioned parts" refers to and includes handles 97–109, switch arm 17 and bimetal 21, actuating member 49 and second spring 65, "closure member for said casing having a substantially plane surface on one side etc.," refers to cover 119 having nothing other than a plane surface for engaging the ends of casing pins 101 and 103.

In Circuit Master the casing is not provided with the "means for slidably receiving" the switch arm C and bimetal D and handle B such as Jennings' pins 101 and 103.

Circuit Master has only a recess in the case for receiving the end of the pivot boss $B^1$ on handle B which will not support the handle B. It is necessary that the Circuit Master cover having the hole for receiving the opposite end of pivot boss $B^1$ be secured to the casing in order to provide support for handle B. The Circuit Master cover does not have the "substantially plane surface on one side" like the Jennings cover 119. The Circuit Master cover is necessarily provided with the hole to receive one end of the pivot boss $B^1$ of handle B.

In Circuit Master the parts, switch arm C, bimetal D, are carried in the handle B, the casing has no means for "slidably receiving" the switch arm such as the pin 101 of Jennings. In this respect Circuit Master resembles the prior patent to Gaynor No. 1,969,263, and not Jennings.

In Pushmatic, (Plaintiff's Exhibit 32a–33) the open-sided case is provided with "means for slidably receiving * * * through the open side of said casing" only the handle B and the output terminal M. The input terminal N and fixed contact E are inserted from the back of the case, and the plate $B^2$ is laid in the case and not slid in upon means for receiving it as in Jennings, and switch arm C and bimetal D are then laid in on the top of the plate $B^2$. The Pushmatic casing has no "means for slidably receiving" the handle B, the plate $B^2$ or the switch arm C, such as the "means" pins 103 and 101 in Jennings.

Neither Circuit Master nor Pushmatic use or respond to the construction of Claim 32 when given the meaning intended in the Jennings specification and drawings.

Claim 33 asserted against both Circuit Master and Pushmatic specifies, page 9, col. 2, lines 66 * * * 71–72 * * * 75, page 10, col. 1, lines 1–13:

"* * * an insulating housing enclosing etc. * * *, said insulating housing comprising two parts etc. * * * and at least one of the said parts of the housing having means for slidably receiving the connected unit including the first said contact and terminal, the unit including said movable contact carrying member, said bimetallic member, said flexible conductor and said other terminal and the unit including said manually movable operating member, and said movable contact carrying member and said manually movable operating member being secured to said one part of the housing only by being slipped into engagement with said means for slidably receiving them and by securing the two parts of the housing together."

In Jennings "an insulating housing" is the casing 95 and cover 119, the part 95 having "means for slidably receiving," viz., slot 105 for "connected unit including the first said contact and terminal" terminal 11 and fixed contact 15; pin 101 for "the unit including said movable contact carrying member (switch arm 17), said bimetallic member (21), said flexible conductor (63) and said other terminal (13);" pin 103 for "the unit including said manually movable operating member (handle 97–109);"—"and said movable contact carrying member (switch arm 17), and said manually movable operating member (handle 97–109) being secured to said part of the housing (part 95) only by being slipped into engagement with said means (pins 101 and 103) for slidably receiving them and by securing the two parts of the housing (95–119) together."

Neither Circuit Master nor Pushmatic housings have the "means" such as pins 101 and 103 of Jennings for "slidably receiving" the unit including the switch arm and bimetal. In Circuit Master the switch

arm and bimetal is received in and carried by the handle B and not by any means in the casing such as Jennings pin 101; in Pushmatic the switch arm and bimetal are laid in on the top of the plate B² and are not slidably received by any such "means" as Jennings pin 101. In Pushmatic the manually movable operating member handle B is not slidably received in the case by any such means as Jennings pin 103.

In neither Circuit Master nor Pushmatic is the movable contact carrying member, i. e., the switch arm "secured" to the housing only by being slipped into engagement with any such "means" as Jennings' pin 101.

In Circuit Master the assembly of handle and switch arm to the case resembles that of prior patent to Gaynor No. 1,969,-263 (Defendant's Exhibit 557) rather than Jennings, and in Pushmatic the assembly of handle and switch arm to the case resembles that of prior patents to Ellis No. 1,860,999 (Defendant's Exhibit 556) of Weber No. 743,207 (Defendant's Exhibit 544) where the parts are simply laid in the case, rather than Jennings.

Neither Circuit Master nor Pushmatic use or respond to the construction of Claim 33 when given the meaning intended in Jennings' specification and drawings and considered in the light of the prior art.

Claim 34 asserted against both Circuit Master and Pushmatic specifies:

"* * * a first assembly unit including a terminal strip * * * and a contact surface * * *, a second assembly unit including a manually movable operating member, a third assembly unit including a movable contact carrying member, a bimetallic element * * * and a second terminal * * * connected by a flexible portion * * *, and a housing in which said three assembly units are mounted in operative relation without being fixedly secured to each other * * *, said housing including two members of insulating material having means for slidably receiving said three assembly units * * *."

"Assembly units" such as those specified in the claim are not separately covered by claims in the Jennings' patent. The use of flexible conductors such as Jennings 63 to connect circuit breaker parts to one another is an old expedient as shown in prior patent to Von Hoorn No. 1,786,-796 (Defendant's Exhibit 504) where flexible conductor or shunt 23 connects switch arm 9 to terminal 15 through medium of clip 12.

In Circuit Master the assembly unit including switch arm and bimetal is assembled in the assembly unit consisting of handle B and not upon any pin in the case such as Jennings' pin 101. Nor are Circuit Master assembly units—handle B, and switch arm C, and bimetal D—mounted separately in the case in operative position or relation as are Jennings' assembly unit handle 97–109 on pin 103, and assembly unit switch arm 17, etc., on pin 101. Consequently Circuit Master does not have "a housing in which said three assembly units are mounted in operative relation without being fixedly secured to each other * * *, said housing having means for slidably receiving said three assembly units." Circuit Master does not have the "means for slidably receiving" the handle assembly unit and the switch arm assembly unit such as the separate pins 103 and 101 of Jennings.

In Pushmatic the "assembly unit" handle B is not "slidably received" in the case or any "means" such as pin 103 of Jennings; nor is the "assembly unit," switch arm C—bimetal D "slidably" received in the case, it is laid in on top of plate B², Pushmatic has no "means for slidably receiving" it such as Jennings' pin 101.

The Circuit Master arrangement of handle and switch arm assembly resembles that of prior patent to Gaynor No. 1,969,263 (Defendant's Exhibit 557) where the switch arm parts 29–27 are carried and assembled to the case with handle 14 (Figs. 1, 5, 7), rather than Jennings.

And Pushmatic resembles prior patent to Ellis No. 1,860,999 (Defendant's Exhibit 557) where the parts are merely laid in the case, and are not assembled to pins for slidably receiving them as in Jennings.

Neither Circuit Master nor Pushmatic use or respond to Claim 34 when the claim is given the meaning intended in Jennings' specification and drawings, and considered in view of the prior art.

Plaintiff claims some merit for the Jennings Patent No. 2,190,517 on account of alleged teaching of so-called "calibration," that is to say, means for adjusting and maintaining the desired overlap latching engagement of the free end 59 of bimetal 21 with the end 61 of actuating member 49, both before and after assembly in the case. There is no statement or teaching in the Jennings specification regarding this matter of calibration other than the explanation on page 3, col. 1, lines 56-74, which explains the use of screw 91 after switch arm 17 and actuating member 49 are assembled on pin 101 in the case, when screw 91 may be turned to adjust the amount of overlap engagement between bimetal end 59 and actuating member end 61.

The calibration arrangements of the Jennings patent are not used by either Circuit Master or Pushmatic, in both of which calibration is adjusted by merely bending the free end of the bimetal relative to the free end of the switch arm, no adjusting screw or other similar means being applicable or used.

No claim of the Jennings patent asserting the calibration feature is asserted to be infringed. And it is conceded (Tr. 2517-2522) that it has never been used commercially by plaintiff.

Claims 15, 22, 23, 28, 29 and 30 of the Jennings Patent No. 2,190,517, unless limited to the specific construction shown in the Jennings specification and drawings, in all material respects find full response in the prior patent to Laganke No. 2,025,872 (Defendant's Exhibit 551). Claims 19, 20, 21, 27, 32 and 35 differ only by reciting that the cover holds the parts in place where Laganke uses a removable cotter pin in addition to his cover, and Claims 25, 31, 33 and 34 differ by calling for a "flexible conductor" for connecting some of the parts, by requiring that the bimetallic element be connected to or mounted on the switch arm, and (in Claim 33) by reciting that the cover holds the parts in place. These differences are immaterial in view of the prior art where in prior patents to Weber No. 743,207 (Defendant's Exhibit 544), DeReamer No. 1,494,221 (Defendant's Exhibit 555), Ellis No. 1,969,263 (Defendant's Exhibit 557), Hodgkins No. 2,073,103 (Plaintiff's Exhibit 20), and the prior invention of Christensen (Defendant's Dep. 560-560A and included exhibits), the cover is used to hold the parts in place in the casing; prior patent to Von Hoorn No. 1,786,796 (Defendant's Exhibit 504) disclosing, and testimony given, that use of "flexible conductors" to connect breaker parts is old, and prior patent to Taylor No. 2,018,904 (Defendant's Exhibit 554) showing bimetallic element 68-70 and the switch arm 56-58 connected together and operating as one part as they do in Jennings. None of this prior art was considered by the Patent Office in granting the claims mentioned.

All of the claims asserted to be infringed are anticipated in all material and substantial respects.

All claims of the Jennings patent No. 2,190,517 asserted to be infringed by Circuit Master and Pushmatic, based as they are on the idea of arranging and using the insulating casing to receive and position and retain the breaker parts in operative relation, are the product of ordinary mechanical skill and not of invention of the character required to warrant and justify a patent, in view of the prior art represented by the prior patents to Laganke No. 2,025,872, Weber No. 743,207, DeReamer No. 1,494,221, Ellis No. 1,860,999, Gaynor No. 1,969,263, Hodgkins No. 2,073,103 and the prior invention of Christensen.

### Petersen Patent Re. No. 21,429.

Petersen patent Re. 21,429 is charged to be infringed only by Pushmatic. No circuit breakers were ever made commercially under this patent.

Claims 19, 20, 21, 22, 23 and 25 are claimed to be infringed. These claims were not in the original Petersen patent No. 2,076,385 (Defendant's Exhibit 578), but are new claims that were added by the application

for reissue. Defendant contends that the claims asserted to be infringed are invalid on the ground that the application for reissue and the oath supporting it failed to comply with the requirements of the statute, 35 U.S.C.A. § 64, and the requirements of Patent Office Rule 87 then in effect, governing applications for reissue of patents.

The failure to comply with the statute and rule is lack of proof of the statutory conditions required for reissue which are that the original patent was partly or wholly inoperative by reason of a defective or insufficient specification on account of the omission of the claims asserted to be infringed in this suit and that the same were omitted from the original patent through error on the part of the original patentee Petersen, and that such error arose through inadvertence, accident or mistake committed by the original patentee Petersen.

It is also contended that the Petersen Patent Re. 21,429, with respect to the claims asserted to be infringed in this suit, is invalid as being for a different invention than the original patent which did not contain such claims.

The original Petersen patent No. 2,076,-385 (Defendant's Exhibit 578) issued April 6, 1937. The application for reissue was filed in the Patent Office on March 31, 1939. The application for reissue was not filed by the original inventor and patentee Petersen, but by plaintiff, Westinghouse Electric & Mfg. Co., assignee of the patent, which had acquired the patent by purchase after Petersen's death.

Petersen died in the latter part of 1937, and subsequent to his death his widow and the executrix of his estate, Stella M. Petersen, offered the original Petersen patent No. 2,076,385 for sale to plaintiff by a letter dated May 16, 1938, written by Petersen's attorney in the original patent, Albert Sperry, who acted also as attorney for Stella M. Petersen in this transaction. This offer to plaintiff opened negotiations that resulted in the purchase by plaintiff on August 10, 1938, of the original Petersen patent No. 2,076,385 and another Petersen patent No. 2,053,629, not here involved,

for the sum of Fifteen Hundred Dollars ($1,500) (Defendant's Exhibit 577, Sperry Deposition and included Exhibits).

Plaintiff prepared an application for reissue of the original Petersen patent No. 2,076,385, and this application and the oath supporting it were signed and executed by R. B. Mildon, a vice president of plaintiff, on March 28, 1939 (Defendant's Exhibit 576, Mildon Deposition and Exhibit 2, File Wrapper and contents of Petersen Re. 21,429 included therein).

Mildon's oath in support of the application for reissue is made on information and belief on March 28, 1939, subsequent to Petersen's death

The oath states that the specification of the original Petersen patent was defective and insufficient in three particulars, of which the third is material in this suit. With respect to the third particular, the oath states,

"(3) Claims of the original patent failed to give the Petitioner protection commensurate with the invention and failed to adequately cover certain novel features of the invention. The patentee has disclosed in manually and automatically operable circuit breakers a releasable and resettable operating mechanism which includes an operating handle that is movable in one direction to close the contacts and in the same direction to open the contacts, and also movable in the same direction to reset said mechanism and reclose said contacts following release and automatic operation of the mechanism. The device also includes indicating means for indicating the position of the contacts. Claims 1 through 13 of the original patent appear to be anticipated by the newly discovered Schoenberg patent and the remaining Claims 14 through 17 of the original patent are limited to specific details of the structure and do not provide full protection on all features of the invention to which the Petitioner is entitled. The Petitioner, therefore, desires to obtain claims which distinguish patentably from the

Schoenberg patent and which cover the features mentioned above."

"The features mentioned above" referred to in the last sentence above quoted are the "certain novel features" referred to and described in the second and third sentences of the portion of the oath quoted above which the original patent is stated to have failed to adequately cover. These are the features now covered by Claims 19 through 23, inclusive, and 25 of the reissue patent which are asserted in this suit to be infringed, and these claims express these features in substantially the same language that is used in the quoted portion of the oath.

With respect to the errors alleged to have arisen in the prosecution of the application for the original patent and alleged to have resulted in failure to claim the novel features above mentioned, the oath states,

"With respect to (3) above, the errors are believed to have arisen by reason of the relative inexperience of the inventor in the drafting of patent claims and his failure to clearly point out to his attorney certain features of the invention which should be covered, and failure of the attorney to recognize and adequately cover all of the features of the invention."

Mildon, who made the oath on behalf of plaintiff, never had any communication with Petersen, Petersen's attorney, Albert Sperry, or Petersen's widow and executrix, or any representative of Petersen, respecting the original Petersen patent No. 2,076,-385, or respecting any of the defects or insufficiencies in the specification of that original patent, alleged in the oath. Mildon presumes his source of information respecting alleged defects or insufficiencies in the specification of the original Petersen patent and respecting the alleged errors in the original Petersen patent and respecting the alleged inadvertence, accident, or mistake from which said error arose, and was a representative of plaintiff's Patent Department. He has no definite knowledge or recollection of the matter, and says it was a routine matter referred to him by the Patent Department with the statement "O.K." and he presumes it was handled similar to other cases. He admits he had no personal knowledge or information regarding the statements set forth in the oath, he has no recollection of whether he read the oath before he signed, and no recollection of whether he was sworn before the notary who subscribed the oath. He admits that at the time he executed the oath, he had not read the application for reissue, had not read the original Petersen patent, had not read the claims applied for in the application for reissue, and had not read the prior Schoenberg patent No. 1,393,322 referred to in the oath (Defendant's Exhibit 576, Mildon Deposition).

Albert Sperry, the attorney for Petersen in the application for the original Petersen patent No. 2,076,385 and who handled the sale of the original Petersen patent to plaintiff on behalf of Petersen's widow and executrix, Stella M. Petersen, had no communication with plaintiff or with any representative of plaintiff with respect to reissue of the original Petersen patent. He was available during the period when the reissue was applied for, states that Mrs. Petersen, Petersen's widow and executrix, was available during that period, and that he was in communication with her, and that so far as he knows, no representative of Westinghouse had any communication with her regarding reissue of the original patent. Sperry also states that Petersen had an intimate knowledge of patents and worked closely with Sperry in the preparation and prosecution before the Patent Office of the application for the original Petersen patent, and that Petersen examined the claims allowed in the original application by the Patent Office and never expressed any dissatisfaction with them (Defendant's Exhibit 577, Sperry Deposition).

It is thus established that Mildon, who made the oath in support of the application for reissue, had no personal knowledge of the original patent, or of any errors in the original patent, or of any defects or insufficiencies in failing to claim in the original patent what might have been claimed and what is now expressed in the

claims asserted to be infringed in this suit. Mildon had no personal knowledge or information that the alleged defects or insufficiencies arose through error or that the alleged error arose through inadvertence, accident or mistake on the part of Petersen or his attorney. Neither Mildon nor plaintiff made any attempt to ascertain from Petersen or Petersen's attorney or Petersen's widow and executrix, whether Petersen considered himself to be the inventor of the broad subject matter now claimed in claims 19–23, inclusive, and 25, of the reissue patent, or considered that there were any defects or insufficiencies in the original patent in failure to claim these novel features, or whether there were any errors in failing to so claim, or whether any of the alleged errors arose through Petersen's inadvertence, accident or mistake or of Petersen's attorney.

Claims 19 through 23, inclusive, and 25, of Petersen Reissue No. 21,429 are for alleged novel features, an invention not covered by the original patent, and result in broadening and enlarging the original patent by reissue. These claims are also for an invention different from that secured and claimed in the original Petersen patent No. 2,076,385 (Defendant's Exhibit 578).

This is evident not only from examination of the claims 1 to 13, inclusive, of the original patent which were omitted in the reissue patent, but also from the fact that in the oath supporting the application for reissue it is stated, not by the original inventor and patentee Petersen, but by Westinghouse, assignee of the original patent after Petersen's death, and who had no knowledge of the matter, that the claims of the original patent failed to adequately cover certain novel features of the invention followed by a description of those novel features which in words and substance is substantially the wording of the newly added reissue claims 19–23, inclusive, and 25, the only claims asserted in this suit to be infringed.

There is no evidence here, and there was no evidence before the Commissioner of Patents in support of the application for reissue, that the inventor and patentee, Petersen, considered the broad invention now expressed in Claims 19 through 23, inclusive, and Claim 25 of the Petersen Reissue No. 21,429 to be his invention, or that the original Petersen patent No. 2,-076,385 was defective and insufficient in failing to claim it or that failure to claim it arose through inadvertence, accident or mistake on the part of Petersen or his attorney.

Despite the fact that both Pushmatic and the circuit breaker described in the specification and shown in the drawings of Petersen Reissue No. 21,429 use push handles, the construction and arrangement of parts in Pushmatic bears no substantial resemblance to that of Petersen described in the specification and shown in the drawings of Petersen patent Reissue No. 21,429. It was testified by defendant's expert, Professor Hoover, that the drawings and specification of the Petersen patent do not teach or suggest the organization and mechanism used in Pushmatic for operating the contacts to open and closed position on manual operation or overload operation.

Petersen discloses a movable contact carrier 22 which carries two movable contacts 24 into and out of engagement with two fixed contacts 28. The movable contact carrier 22 has two open positions as shown in Figs. 5 and 6 of the patent. It is maintained in closed position only by engagement of the end of the stop arm 30 on the movable contact carrier 22 with the free end of the bimetal 32 which has its opposite end fixed to the breaker casing.

In automatic overload operation, the bimetal 32 warps outwardly away from the stop 30 and the contact carrier 22 rotates automatically to open position, as shown in either of Figs. 5 and 6 of the patent, depending upon whether stop arm 30 was engaged in the slot 36 in the bimetal 32 with the inner edge of the material at the end 34 of the slot 36, as shown in Fig. 3 of the patent, or with the outer end of bimetal 32, as shown in Fig. 4 of the patent. In manual operation, if the stop arm 30 on the contact carrier 22 is engaged in

the slot 36 in bimetal 32, as in Fig. 3, pushing in handle 8 will cause it to go to the open position shown in Fig. 5, and a second push on the handle will cause it to return to closed position, as shown in Fig. 3. If the stop arm 30 on carrier 22 is engaged with the outer end of bimetal 32, as shown in Fig. 4, pushing in handle 8 will cause it to go to the open position shown in Fig. 6, and a second push will cause it to return to closed position as shown in Fig. 4.

The handle 8 operates the movable contact carrier 22 through a toggle mechanism and overcenter spring 10–12–14, the contact carrier 22 is mounted on the toggle member 12, the handle 8 engages the other toggle member 10 through blade 64, and the toggle member 10 operates the toggle member 12 through the overcenter spring 14. Pushmatic has no such movable contact carrier mechanism as that of Petersen, nor any such toggle mechanism to operate it.

In Pushmatic there is only one movable contact and one fixed contact. The movable contact carrier or arm and the bimetal member are a single unit fixedly secured together. There is no latching of the movable contact arm of Pushmatic to the fixed case or any part of it by the bimetal; there is no toggle mechanism and overcenter spring mechanism interposed between the handle and movable contact arm of Pushmatic by means of which the contact arm is operated by the handle to open and close the contacts.

In Pushmatic in manual operation the contacts are opened by pushing in the handle, and they can be closed only by releasing the handle and permitting it to move outwardly or in the opposite direction. After overload release and in order to reset the mechanism and reclose the contacts, the handle is pushed in to reset the mechanism, that is, to re-engage the contact arm and bimetal with the slidable plate in the Pushmatic casing, and then to reclose the contacts, the handle must be released and move outwardly or in the opposite direction.

In Petersen in manual operation inward movement of the handle opens the contacts, and they are closed on inward movement of the handle regardless of whether they have been opened manually or automatically by overload, no outward movement of the Petersen handle is required to reclose the contacts. In Petersen resetting of the mechanism after overload release is the same as reclosing the contacts and occurs at the same time and upon the same inward movement of the handle.

Claims 19 through 23, inclusive, of Petersen patent Reissue 21,429, asserted to be infringed, each, with immaterial variation in wording, call for:

"* * * relatively movable contacts, a releasable and resettable operating mechanism operable manually to open or to close said contacts * * and a manually operable handle * * movable in the same direction to cause said mechanism to open or to close said contacts, and also movable in the same direction after release of said mechanism to reset said mechanism."

Pushmatic has no releasable and resettable operating mechanism which copies or resembles that disclosed in the Petersen specification and drawings, and could not use Petersen's mechanism.

The manually operable handle of Pushmatic is not movable in the same direction to open or to close said contacts and also in the same direction after release to reset said mechanism, as called for by the claims. Pushmatic handle moves in the same direction to open the contacts and to reset the mechanism, But has to move in the opposite direction to close the contacts in both manual and overload operation.

Claims 20 to 23, inclusive, call for the handles as:

"* * * movable in the same direction following release of said mechanism to reset said mechanism and simultaneously reclose said contacts."

Pushmatic does not respond to this call as the handle is moved inwardly to reset following release of the mechanism on overload, but has to move outwardly in the opposite direction to reclose the contacts.

Claim 25 calls for:

"* * * relatively movable contacts and operating mechanism operable

manually to normally open and close said contacts * *. * and a manually operable handle movable in one direction to cause said mechanism to normally open said contacts and movable in the same direction to cause said mechanism to normally close said contacts and also movable in the same direction after current responsive operation of said mechanism to reclose said contacts."

Pushmatic has no operating mechanism for manually and normally opening and closing the contacts that copies or resembles that disclosed in the Petersen drawings or specification, and Pushmatic could not use Petersen's mechanism. The Pushmatic handle has to move inwardly to open the contacts and outwardly in the opposite direction to close the contacts or to reclose the contacts after automatic opening.

Pushmatic does not respond to the claims asserted to be infringed.

The use of push buttons movable in the same direction to open or to close contacts in switches is an old arrangement as shown in the prior patents to Kerwin No. 1,502,785, dated July 27, 1924 (Defendant's Exhibit 571); Inaba No. 1,748,881, dated February 25, 1930 (Defendant's Exhibit 572); Baxter No. 1,535,559, dated April 28, 1925 (Defendant's Exhibit 573).

None of these prior patents were considered by the Patent Office in allowing the Petersen claims in suit. The push-button mechanism disclosed in these patents are very similar to that used by Petersen; the push buttons operate blades to engage and operate pivoted and oscillating movable contact carriers and over-center springs. Kerwin No. 1,502,785, page 1, lines 12–19, states:

"My invention relates to an electric switch of the general class which employs a single spring-returned push-button for alternately moving the switch to its on and its off positions upon consecutive movements of the push button against the pressure of a spring which holds this button yielding in its normal position."

Inaba No. 1,748,881 discloses the same type of push button device, and in addition states, page 1, lines 4–8:

"* * * and has for its object to provide a push-button switch indicating its opening and closing by length of the push-button extending outwardly through the body of the switch."

Pushmatic indicates whether the contacts are open or closed by length of the push handle extending outwardly of the case, the handle extends outwardly further when the contacts are open than it does when they are closed. Pushmatic also has an on and off sign operated directly by the handle which also indicates whether the contacts are open or closed. Petersen also has an on and off sign which is operated directly by his contact operating member 12 and not by direct connection to his handle 8.

Baxter No. 1,535,559 shows the same type of push button device and on and off sign. It states, page 1, lines 9–15:

"My invention relates to push button electric switches, and it has for its object. the provision of a simple and compact construction wherein a single push button serves to both open and close the switch and to actuate an indicator which shows the position of the enclosed connecting members."

Petersen Reissue No. 21,429, page 2, col. 2, lines 31–35, recognizes that push buttons, turn buttons, levers or the like, may be used as desired.

There was no patentable invention at the time of the Petersen invention in the broad idea of applying push button operating devices such as those applied to switches in the prior patent to Kerwin, or push button operating devices with "on" and "off" signals such as those in the prior patents to Inaba and Baxter, to circuit breakers, as might be done by simply applying them to the overload circuit breaker device of the prior Getchell patent No. 1,708,222, dated April 9, 1929 (Defendant's Exhibit 570, 574, 575).

British Patent No. 401,957 of 1933 (Defendant's Exhibit 563), prior to any date claimed for Petersen Reissue 21,429, dis-

closes a push button operated automatic overload release circuit breaker which is operable manually to open and close the contacts, and also operable upon occurrence of overload or excess current to automatically open the contacts. It has a manually operable push button handle movable in the same direction to open the contacts, to close the contacts, and to reset and reclose after automatic release, as does the Petersen device. This prior patent was not considered by the Patent Office in allowing the Petersen Reissue patent.

When the claims of the Petersen Reissue Patent No. 21,429 asserted to be infringed are read without regard to or limitation to substantially the device disclosed in the Petersen drawings and described in the specification, as they are construed by plaintiff in attempting to find response in the different Pushmatic structure, the claims will also describe and include the circuit breaker disclosed in the British Patent No. 401,957.

The prior U. S. Patent to Kendig Reissue No. 17,650, dated April 22, 1930 (Defendant's Exhibit 566) discloses an automatic overload release switch mechanism or circuit breaker. It is operated by a turn button handle always turned in the same direction to open and to close the contacts in manual operation, and to close the contacts after automatic overload release. Prior U. S. Patent to Perkins, No. 563,407, dated July 7, 1896 (Defendant's Exhibit 569) discloses an "on" and "off" sign applied to a turn button switch. Neither the Kendig Reissue patent nor the Perkins patent were considered by the Patent Office in granting the Petersen Reissue Patent.

Petersen Reissue Patent in suit recognizes on page 2, col. 2, lines 31–36 that push buttons, turn buttons, levers or the like, may be used as desired to operate circuit breakers.

One of the claims in suit, No. 22, specifies:

"a manually operable push button handle biased to a normal position and movable in the same direction to cause opening or closing of said contacts."

However, in view of the recognition in the Petersen patent that push buttons or turn buttons may be used as desired, the use of a turn button handle in place of a push button handle does not constitute any novel distinction.

When the claims of the Petersen Reissue Patent 21,429 asserted to be infringed in this suit are read and construed without regard and limitation substantially to the circuit breaker structure and mechanism disclosed in the drawings and described in the specification of the Petersen patent, as plaintiff construes them in its contention that they find response in the different Pushmatic breaker structure, they will describe and are met in all substantial respects by the circuit breaker disclosed in the Kendig Reissue Patent 17,650.

Swingle Patent No. 2,329,362

▮ Swingle Patent No. 2,329,362 is charged to be infringed only by Circuit Master. Claims 27, 53, 54, 69, 70 and 76 through 80, inclusive, are asserted to be infringed.

No circuit breakers of the constructions shown in the drawings and described in the specification of the Swingle patent have ever been made in commercial production. The Multi-Breaker (Plaintiff's Exhibit 35) is said to be made under the Swingle patent, and to be covered by claim 27 only of the claims in suit. Multi-Breaker is not the construction shown in the drawings and described in the specification of the Swingle patent; it is made under other patents, notably a patent of the Square D Company No. 2,096,546 to Jackson (Defendant's Exhibit 580) under which plaintiff and others have a license, and it is substantially identical with the construction shown in the drawings and described in the specification of the Jackson patent.

Circuit Master is neither a copy nor an imitation of the circuit breaker shown in the drawings and specification of the Swingle patent. Defendant's expert witness, Professor Hoover, testified that the Swingle and Circuit Master constructions are fundamentally different, and that he did not see how anything could be learned from the Swingle disclosure, or specification,

that would lead one to design the Circuit Master.

Swingle uses a switch arm and a handle each separately pivoted, and in the form shown in Figs. 1 to 3 of the drawings, overcenter springs 35 interposed between handle 42 and switch arm 13, and in the form shown in Figs. 7 to 9 of the drawings, an overcenter spring 143 and toggle mechanism 139–141 interposed between handle 135 and switch arm 117, and in both constructions, in Figs. 1 to 3 and 5, a frame 3, and in Figs. 7 to 9, 12 and 13, frames 113 and 121 are used for guiding the switch arm. Circuit Master (Plaintiff's Exhibit 26a, 27) uses only a pivoted handle B with the switch arm C carried directly thereby and operating as a unit therewith in manual operation—without any spring or toggle mechanism interposed between handle and switch arm—and without any frame for guiding the switch arm.

Swingle uses a bimetal (7 in Figs. 1 to 3, and 107 in Figs. 7 to 9) fixed to the breaker casing with which the end of the switch arm has pivotal engagement and which provides a fixed pivotal support for the end of the switch arm in manual operation. This pivotal engagement between switch arm and bimetal fixed to the casing is released in overload operation. The bimetal has no engagement whatever with the handle. In Circuit Master the bimetal D is fixed to the switch arm C, cooperates directly with the handle B, has no engagement whatever with the casing, and forms no pivotal support or connection for the switch arm in manual operation.

Swingle employs overcenter springs 35 (Figs. 1 to 3), an overcenter spring 143 and a toggle mechanism 139–141 (Figs. 7 to 9) for manual snap action operation both to open and close the contacts, and a second spring 47 (Figs. 1–3) and 169 (Figs. 7 to 9) to obtain opening of the contacts on overload release. Circuit Master employs only one spring G for both manual and overload operation, and obtains a quick closing only when the handle is unrestrained. Circuit Master's manual opening is not snap action.

Circuit Master, in arrangement and operation of conventional circuit breaker elements, is similar to that shown in the prior patent to Laganke No. 1,789,183, dated January 13, 1931 (Defendant's Exhibit 541) and not to that shown in the Swingle patent.

Characteristic of both Laganke and Circuit Master is the fact that the handle, switch arm and bimetal are arranged and assembled as a unit, the movable switch arm in each case is hinged to and carried by the handle, moves as a unit with the handle in manual operation and is releasably latched thereto by a bimetal element which upon occurrence of overload or excess current, warps and releases the switch arm so that it pivots on its hinge with the handle and moves to open the contacts without movement of the handle. Resetting the mechanism after overload release is also similar, in both Laganke and Circuit Master the handle is moved to open position to relatch the bimetal and the switch arm, and then to closed position to reclose the circuit. One difference between them is of importance in view of the breaker construction shown in the Swingle patent—it is that in Laganke one spring 9 is used to obtain opening and closing of the contacts in manual operation, while a second spring 15 is used to obtain opening of the contacts upon overload release; Swingle also discloses the use of one spring or set of springs (35 in Figs. 1–3 and 143 in Figs. 7–9) to obtain opening and closing of the contacts upon manual operation, and a second spring (47 in Figs. 1–3 and 169 in Figs. 7–9) to obtain opening of the contacts upon overload release. Circuit Master employs only one spring G for both manual and overload operation.

Swingle patent claims Nos. 27, 53, 54, 69 and 70, read and construed without regard to the drawings and specification of the Swingle patent, will describe the structure disclosed in the prior Laganke patent in all substantial respects, as well as they will describe Circuit Master, and if construed to include and cover Circuit Master are invalid in view of the prior Laganke patent. This prior Laganke patent was not

considered by the Patent Office in allowing the claims of the Swingle patent (Defendant's Exhibit 586, Patent Office file of Swingle Patent No. 2,329,362).

In connection with all the claims of the Swingle patent in suit, and particularly in connection with claims 27 and 76 to 80, inclusive, plaintiff emphasizes allegedly novel and surprising functions of the Swingle overcenter springs used in the structure of Figs. 1 to 3 of the patent. The alleged novel functions of springs 35 are (1) to pull the switch arm 13 to open position and hold it there when the handle 42 is thrown to open position, (2) to pull the switch arm 13 to closed position and hold it there when the handle 42 is thrown to closed position, (3) to cause the movable contact 31 to press against the fixed contact 5 when the switch arm 13 is in closed position, and (4) to pull the movable contact 31 away from the fixed contact 5 when the bimetal 7 warps on overload and releases the switch arm from its manual operating position.

These functions of an overcenter spring in a circuit breaker, interposed between handle and switch arm as in Swingle, are disclosed in the prior patent to Krantz No. 1,726,233, dated August 27, 1929, a patent owned by plaintiff (Defendant Exhibit 500).

None of the claims Nos. 27, 53, 54, 69, 70 and 76 through 80, inclusive, of the Swingle Patent No. 2,329,362, which are asserted to be infringed by Circuit Master, specifically call for more than one spring for operating the circuit breaker, and all of these claims specify by various wording the function of opening the contacts on overload release in addition to the manual opening and closing of the contacts.

. The Swingle specification and drawings disclose and describe two forms of circuit breakers; one, shown in Figs. 1 to 3, discloses spring 35 for operating the switch arm 13 to open and closed positions in manual operation, and a second spring 47 for obtaining the required opening of the contacts on overload release; the second form, shown in Figs. 7 to 9, uses spring 143 to control opening and closing of the contacts in manual operation and a second

spring 169 to obtain the required opening of the contacts on overload release.

It is neither stated nor suggested in the specification of the Swingle patent that the required opening of the contacts on overload release can be obtained with the structures disclosed in that specification without the use of the second springs 47 in the mechanism shown in Figs. 1 to 3, and 169 in the mechanism shown in Figs. 7 to 9. All such operations described in the specification contemplate the use of these second springs to obtain the required opening of the contacts on overload release.

Plaintiff admits that the mechanism of Figs. 7 to 9 of the Swingle patent will not operate to obtain the required opening of contacts on overload release without the second spring 169. Plaintiff's expert also admits that claims 53 and 54 are supported only by the structure shown in Figs. 7 to 9. He contends that claims 69 and 70 are supported also by the structure of Figs. 1 to 3, but is unable to apply the terms of the claims to corresponding mechanical parts in the different structures; however, when claims 69 and 70, which were claims 72 and 73 in the Swingle application, were presented to the Patent Office in the amendment of March 15, 1939 (Defendant's Exhibit 586, Patent Office file of Swingle Patent No. 2,329,362, Paper No. 31), they were presented as applying only to the structure shown in Figs. 7 to 9 of the Swingle drawings. The remaining claims, 27 and 76 to 80, inclusive, plaintiff contends are supported by the structure shown in Figs. 1 to 3 of the drawings.

Plaintiff's expert witness testifies that he believes the spring 35 of the mechanism shown in Figs. 1 to 3 of the Swingle patent will obtain the required opening of the contacts on overload release without the use of the second spring 47 and on this ground contends that all of the claims of the Swingle patent asserted to be infringed by Circuit Master should be construed as requiring only one spring.

Plaintiff admits that there has been no commercial experience with the circuit breaker structure disclosed in Figs. 1 to 3 of the Swingle patent which would or does demonstrate that it can be operated

successfully without spring 47. Plaintiff's expert admits that he has never seen a model of that structure and does not know from having seen an actual device made according to Figs. 1 to 3 of the drawings that it would operate to obtain the required opening of the contacts on overload release without the second spring 47. Defendant's expert testified that he did not believe that the structure of Figs. 1 to 3 would operate to obtain the required opening of contacts on overload release without the second spring 47, and that he had tried to make a model of it, but could not make anything that would work correctly.

It is true that the Patent Office allowed the claims in question which do not specifically call for the second spring to obtain the required opening of the contacts on overload release. However, there is no evidence that the question of whether the structure of Figs. 1 to 3 would operate to obtain the required opening on overload release without the second spring 47 was ever raised in the Patent Office during the prosecution of the application for the patent. The question that is presented in this trial, with respect to the matter, was never raised or considered by the Patent Office.

There is no evidence presented by actual demonstration that the circuit breaker of Figs. 1 to 3 will operate to obtain the required opening of the contacts on overload release without the second spring 47, and the specification of the Swingle patent neither states nor suggests that the spring 47 may be omitted—all of the description contained in the specification contemplates the use of the second spring 47 (Swingle Patent specification, page 1, col. 1, lines 51–55, col. 2, lines 1–11; page 2, col. 2, lines 7–23; page 3, col. 1, lines 69–75, col. 2, lines 1–11, lines 46–58; page 5, col. 2, lines 67–75; page 6, col. 1, lines 1–4, lines 20–27). Neither the specification nor the drawings of the Swingle patent disclose, teach or suggest a circuit breaker construction that may be made to operate successfully to obtain the required opening of the contacts on overload release without the use of the second springs 47 and 169, nor is it shown to be obvious

that this could be done with the construction shown in the drawings and described in the specification of the Swingle patent.

Consequently, the claims of this patent to a breaker structure which include the function of manually operating the breaker contacts to open or closed position and also the function of opening the breaker contacts on overload release, as do all the claims asserted here to be infringed, if construed to require only a single spring, are claims to an inoperative and useless structure in the Swingle specification, or are claims to an invention which Swingle did not make and disclose how to accomplish in his patent specification and are void as claiming more than Swingle actually invented.

When construed to include the second spring, the claims are not infringed by Circuit Master for the reason that it omits that mechanical element which is essential in the combinations of breaker parts which Swingle invented.

Claims 27, 69, 70, and 77 through 80, inclusive, each specifically call for a "floating switch arm" which is described in the specification, page 2, col. 1, lines 17–21, as:

"A floating switch arm 13, which includes a contact member 31 for cooperating with the fixed contact 5, has no permanently fixed pivot point and is adapted to be guided by the main frame 3 of the operating mechanism."

And on page 3, col. 2, lines 74–75, page 4, col. 1, lines 1–8:

"The embodiment of my invention illustrated in Figs. 7 to 13 operates on essentially the same principle as the previously described embodiment, that is, the switch arm is a full floating lever, one end of which is engaged by an electro-responsive support trip element in order to provide a pivot point for the switch arm, and an operating mechanism pivotally engages the switch arm at an intermediate point in order to permit normal operation of the breaker."

And on page 5, col. 2, lines 67–75, page 6, col. 1, lines 1–4:

"I have thus described two preferred embodiments of my improved circuit interrupter * * *. Specifically, I have provided a circuit breaker utilizing a switch member, which is essentially a floating lever, normally biased to the open circuit position by means which is ineffective, except upon the occurrence of predetermined overload conditions, to cause the opening of the breaker."

And on page 6, col. 1, lines 20–27:

"Both of these structures, however, utilize a floating switch arm, releasably supported at one end by a thermally responsive device, means normally ineffective, for biasing the contacts open, and means which engages the switch member intermediate its ends for effecting normal operation thereof with a snap action to both open and closed positions."

Claim 27 specifies "a floating arm carrying said movable contact;" claims 69 and 70 specify "a floating switching member carrying a contact surface adjacent to one and cooperating with said stationary contact;" claim 77 specifies "a floating current conducting switch arm movable to actuate said contact means to open and to closed positions;" claim 78 specifies "a floating arm carrying one of said contacts;" claim 79 specifies "a rigid floating switch arm electrically connected in the circuit and having said movable contact rigidly mounted thereon;" and claim 80 specifies "a floating arm carrying one of said contacts."

Circuit Master (Plaintiff's Exhibit 26A, 27) switch arm C has a fixed pivot T in the handle B which it never leaves on overload operation, and in manual operation it always remains a unitary part of the handle B. Circuit Master's switch arm C is never guided by any main frame such as main frame 3 of Swingle, Figs. 1 to 3 and 5, or frames 113 and 121, Figs. 1 to 9, 12 and 13, of Swingle. The Swingle switch arms 13, Figs. 1 to 3, and 117, Figs. 7 to 9, are detached from their pivotal supports and connection with bimetal 7 at 19, Figs. 1 to 3, and bimetal 107 at 125, Figs. 7 to 9, on over-

load operation and consequently, have no permanently fixed pivot point. Circuit Master's bimetal D is never disconnected from switch arm C and never constitutes a releasable pivotal support for the switch arm C, as do the bimetals 7 and 107 for the switch arms 13 and 117 in Swingle. Consequently, Circuit Master's switch arm C is never without a fixed pivot point and never floats as do the switch arms 13 and 117 in Swingle when released by the bimetals 7 and 107.

Circuit Master does not have the "floating" switch arm designated by these claims and described in the Swingle specification.

Claim 76 of the Swingle patent omits the word "floating" and specifies "a switch arm carrying said movable contact thereon, a pivot axis about which said switch arm is normally movable between open and closed position, a bimetallic latch member acting directly on one point of said switch arm." In Circuit Master the bimetal D does not act directly on one point of the switch arm C nor provide a pivot point for the switch arm as do the bimetals 7 (Figs. 1–3), and 107 (Figs. 7–9), of Swingle which act directly on the switch arm 13 (Figs. 1–3) and 117 (Figs. 7–9) during manual operation and constitute the sole pivotal support and connection 19–20 (Figs. 1–3) and 125–181 (Figs. 7–9) for the switch arms. The Swingle specification clearly designates this pivoted connection and relation of bimetal to switch arm where it states, page 1, col. 1, lines 53–55, col. 2, lines 1–3, and then lines 12–13:

"The simpler of these two preferred embodiments comprises a movable switch arm, an electro-responsive support means for releasably engaging one end of the switch arm to provide a pivot point therefor, * * *. The other preferred embodiment is essentially similar to the simpler form, except that a toggle link mechanism is utilized for causing manual operation of the breaker."

And on page 3, col. 2, lines 46–51:

"From the foregoing, it will be seen that the circuit breaker of my invention comprises essentially little more than a

floating switch arm, an electro-responsive support for engaging one end of the switch arm so as to provide a pivot point therefor, * * *."

And on page 3, col. 2, lines 74–75, page 4, col. 1, lines 1–5:

"In the embodiment of my invention illustrated in Figs. 7 to 13 * * *, the switch arm is a full floating lever, one end of which is engaged by an electro-responsive support trip element in order to provide a pivot point for the switch arm, * * *."

The Swingle specification and drawings require that the bimetal releasably engage one end of the switch arm and provide a pivot point for the switch arm at the point of engagement. In Circuit Master the bimetal D is fixed to the switch arm C and does not engage or act directly on one point of the switch arm to provide a pivot point therefor. The switch arm C never pivots on the bimetal D in Circuit Master and has no pivotal engagement with it. The Swingle patent does not suggest any such arrangement and relation of switch arm and bimetal as that used by Circuit Master. Claim 76 which contemplates the arrangement of bimetal and switch arm as described in the Swingle specification, does not cover and is not infringed by Circuit Master which does not have that arrangement.

Claims 76 to 80, inclusive, of the Swingle patent were presented in the Swingle application by an amendment of June 8, 1940, six years after the filing of the application (Defendant's Exhibit 586, Patent Office file and contents of Swingle Patent No. 2,329,362).

It is admitted by Swingle, who is one of the patent attorneys for plaintiff, that shortly before he prepared these claims he had learned of Circuit Master from defendant, that he prepared the claims having the construction of Circuit Master particularly in mind, and that he took care to draft them so that they would cover the Circuit Master construction. In the amendment presenting these claims to the Patent Office, prior patent to Krantz, No.

1,726,233 (Defendant's Exhibit 500), and others not of moment here, was referred to in the amendment and it was stated that the claims had been added to more fully protect applicant's invention and had been carefully drawn to avoid the prior art cited by the Examiner and the references to which attention was called in the amendment. Nothing was said with respect to any differences by which the claims presented were distinguished from the Krantz patent and no comment about these claims was ever made by the Examiner.

It was demonstrated at the trial by application of the claims to the structure of the prior Krantz patent that they differ from Krantz only in minor and insignificant respects.

In view of the fact that the Circuit Master construction and arrangement of parts is substantially different from that of the constructions described in the specification and shown in the drawings of the Swingle patent which do not suggest the Circuit Master construction, the fact that the Circuit Master construction and arrangement of parts resembles that of the prior patent to Laganke No. 1,789,183 (not considered by the Patent Office in granting the Swingle Patent) rather than Swingle, the fact that the Circuit Master construction does not employ or contain the second spring for obtaining required opening of the breaker contacts on overload release, as do the circuit breakers described in the specification of the Swingle patent, the fact that Circuit Master does not employ a floating switch arm which has no fixed pivot point such as employed in the structures of the Swingle patent, and the fact that in the Circuit Master construction the bimetal does not releasably engage the switch arm and provide a pivot point therefor as in the Swingle constructions, all of the claims of the Swingle patent in suit, including those added for the purpose of attempting to cover the Circuit Master, must be limited in the respects mentioned to the structures disclosed in the Swingle specification, and as so limited, do not cover and are not infringed by defendant's Circuit Master circuit breaker.

### Jennings Patent No. 2,229,412

■ The Jennings patent in suit, No. 2,229,412, is charged to be infringed only by Circuit Master. Claims 9, 10, 11, 12, 24 and 27 to 40, inclusive, are asserted to be infringed.

No circuit breakers of this patent have ever been commercially produced.

The Jennings Patent No. 2,229,412 discloses a circuit breaker structure which is substantially different from the construction and arrangement of parts in the Circuit Master. It was testified by defendant's expert that the circuit breaker disclosed in the Jennings patent is so fundamentally different from the Circuit Master construction that study of the drawings and specification of the Jennings patent would not lead one to design a structure at all similar to the Circuit Master device.

The Jennings patent discloses a circuit breaker with a handle 57 pivoted and mounted in the case separate from the switch arm 15, with a reciprocating operating member 55 interposed between the pivoted handle and the separately pivoted switch arm and with the handle pivotally engaging one end of the reciprocating operating member 55, and the switch arm pivotally engaging the opposite end of the operating member 55.

The Circuit Master (Plaintiff's Exhibit 26A, 27) has the handle B and the switch arm C mounted and operating as a unit in manual operation, and it has no reciprocating operating member such as Jennings' 55 or other operating means interposed between the handle and the switch arm.

Jennings' switch arm 15 is releasably latched to a stud 37 fixed to the breaker casing. The Circuit Master switch arm C is never latched to the casing, it is mounted in and latched to the handle B and has no latching engagement with the casing. In the Jennings breaker, in manual operation the switch arm 15 must pivot about two points, i. e., (1) the point of latching engagement with the casing where the end 47 of the switch arm 15 has latching engagement with the stud 37 fixed to the casing, and (2) the point 61–63 where the end 61 of the reciprocating operating member 55 engages the opening 63 in the switch arm 15 (Figs. 2 and 3). In the Circuit Master, in manual operation, the switch arm C is carried as a unitary part of the handle B and does not require or use two pivotal points for manual operation and it never pivots about its latching point where the bimetal D engages with its end D1 with the part P of the handle.

In the breaker construction shown in the Jennings Patent No. 2,229,412 the switch arm 15 is made of bimetal. No construction is shown in which the switch arm and bimetal are separate parts. The Jennings structure is substantially identical with that of the prior Jackson Patents No 2,096,545, dated October 19, 1937, application filed April 1, 1936 (Defendant's Exhibit 584), and No. 2,096,546, dated October 19, 1937, application filed August 15, 1935. (Defendant's Exhibit 580), and No. 2,096,547, dated October 19, 1937, application filed August 15, 1935, (Defendant's Exhibit 585). The application for the Jennings Patent No. 2,229,412 in suit was filed on December 17, 1936, and the patent granted January 21 1941. No date of invention for the Jennings patent is claimed prior to the filing date of the application on December 17, 1936. The structures of the Jackson patents are therefore prior to the Jennings patent and were so treated in the prosecution of the application for the Jennings Patent (Defendant's Exhibit 583, Patent Office file of Jennings Patent No. 2,229,412). The principal difference between the circuit breaker construction disclosed in the Jennings patent and the circuit breaker constructions disclosed in the Jackson patents is. that in the Jennings construction the switch arm 15 is bimetal and latches to a non-bimetal stud 37 which is part of the fixed terminal 33 secured to the casing of the breaker, while in the Jackson Patents Nos. 2,096,546 and 2,096,547 the bimetal 18 is secured to the fixed terminal 21 which is fixed to the breaker casing, and latches to the end of the movable switch arm 14 which is not bimetal. In the Jackson Patent No. 2,096,545 the same construction and arrangement of parts is shown as in the Jackson Patents 2,096,546–7, the only difference being that the parts are designated by different numbers, the bimetal being 7, the

fixed terminal 8, and the switch arm 9. Thus, the only difference between the Jennings structure and the prior Jackson structures is a reversal of parts, in Jennings the bimetal is, or is part of, the switch arm and latches to the terminal fixed to the breaker casing, where in the Jackson structures the bimetal is part of the terminal fixed to the casing and latches to the switch arm.

In the prosecution of the application for the Jennings Patent No. 2,229,412 before the Patent Office, the patent examiner called attention to the prior Jackson Patents No. 2,096,545 and 2,096,547 (Defendant's Exhibit 583, Patent Office file of Jennings Patent No. 2,229,412, Paper No. 6). Of the claims in suit only 9, 10, 11 and 24 were then in the application, but the Jackson patents were noted by the examiner only in connection with another claim (application claim 20, later cancelled) of no moment here.

In the amendment of July 6, 1938, to the Jennings application (Defendant's Exhibit 583, Paper No. 8), the only distinction pointed out between Jennings and Jackson is as follows:

"Claim 20 patentably distinguishes from the Jackson patents by reciting that the floating switch arms are composed of bimetallic material. * * * The applicant's novel structure and combination of elements performs all of the functions of the devices disclosed in the Jackson patents, and yet is simpler in that it contains fewer main elements. Consequently, the applicant's load center device can be manufactured at a considerably lower cost than the combinations disclosed by the Jackson patents. By providing switch arms of bimetallic material in the combination claimed the applicant has eliminated the necessity of providing a plurality of switch arms and a plurality of thermal current responsive elements as separate· elements in the load center device. In the Jackson patents the switch arms and the current responsive trip elements are disclosed as separate elements. The omission of an element from a combination with-

out the loss of its function has long been recognized as a high order of invention."

This is the only comment made during the prosecution of the Jennings application with respect to the Jackson patents and the relation of the Jennings claims to those patents.

The distinction and advantage of the Jennings circuit breaker structure as compared with the structures of the Jackson patents is stated in the above-quoted amendment to be that "by providing switch arms of bimetallic material in the combination claimed, the applicant has eliminated the necessity of providing a *plurality of switch arms* and a *plurality of thermal current responsive elements* as *separate elements* * * *. In the Jackson patents the switch arms and the current responsive trip elements are disclosed as separate elements."

In the Circuit Master construction the switch arms C and the bimetal elements D are separate parts, are of different material, are manufactured separately, and in assembly the separate bimetal part D is riveted to the separate switch arm part C. Thus, the advantage of eliminating the necessity of providing or manufacturing switch arms and bimetallic elements as separate parts is not attained in the Circuit Master construction any more than it is in the construction of the prior Jackson patents.

It appears from the evidence produced at the trial in this case that the alleged advantages of the circuit breaker construction of the Jennings patent over the constructions shown in the Jackson patents are of no practical or commercial importance as alleged in the amendment. The circuit breaker structures of the Jennings patent have never been made commercially. The Jackson patents above referred to disclose and cover the Multi-Breaker circuit breaker construction (Plaintiff's Exhibit 38), which plaintiff manufactures under a license taken from the Square D Company under the Jackson patents on June 1, 1936, and which it was manufacturing at the time of the above-quoted amendment on June 6, 1938, and has

continued to manufacture since that date. Commercially it has ignored the circuit breaker constructions of the Jennings patent for those of the prior Jackson patents.

It was conceded in the proceedings before the Patent Office on the application for the Jennings patent (Defendant Exhibit 583, Paper No. 12) that it was old in circuit breaker constructions to mount or secure switch arm and bimetal together as a unit, and to be shown in the prior patents to Sachs, Nos. 1,840,978, dated January 12, 1932, and 2,131,640, dated September 27, 1938, and in the prior patent to Taylor No. 2,018,904, dated October 29, 1935 (Defendant's Exhibit 554), where it was stated:

"While the two Sachs patents and the Taylor patent show a switch member including a moving contact and a bimetallic element which are movable together they do not show the contact and bimetallic element moving about a different pivot point upon overload release from the pivot point about which they move normally."

In the proceedings before the Patent Office a petition to renew the already allowed Jennings application was made after plaintiff had learned of the Circuit Master from defendant, with the purpose of amending claims 10, 11 and 24 and of adding new claims 27 to 40 to cover the Circuit Master. These claims, and claim 9, are all of the claims asserted in this suit to be infringed by Circuit Master.

In the amendment accompanying this petition for renewal (Defendant's Exhibit 583. Patent Office file of Jennings Patent, Paper No. 12), attention of the Patent Office was called to the above-mentioned prior Sachs and Taylor patents, and also to prior Laganke Patent No. 1,789,183, dated January 13, 1931 (Defendant's Exhibit 541), and to distinguish the claims from these prior patents, it was stated:

"Allowed claims 10 and 11 (now claims 10 and 11 of the patent) and claim 25 (now claim 24 of the patent) have been amended to improve their terminology and better cover applicant's invention. * * *

"New claims 28 through 41 (now claims 27 to 40 of the patent) have been added in order to protect applicant's invention with more certainty. In the applicant's structure the moving contact and the bimetallic element move as a unit about one pivot point during normal opening and closing of the breaker and about a second pivot point upon the occurrence of an overload. None of the references of record show this feature of a contact and a current responsive element movable about either one of two pivot axes. These new claims have also been drawn to avoid the following additional patents," (here the Sachs, Taylor and Laganke patents above noted were listed).

"While the two Sachs patents and the Taylor patent show a switch member including a moving contact and a bimetallic element which are movable together, they do not show the contact and bimetallic element moving about a different pivot point upon overload release from the pivot point about which they move normally. The patent to Laganke shows two pivot points, but the bimetallic member does not move with the contact member upon overload release."

The amendment and the new claims were allowed without comment or discussion by the Patent Office.

With respect to the matter of the movement of the switch arm about one pivot point during normal opening and closing of the breaker and about the second pivot point upon the occurrence of an overload, no note was taken of the fact that the switch arm of the Jennings breaker, with respect to its pivotal action during normal opening and closing of the breaker and upon the occurrence of an overload, is precisely the same as that of the prior Jackson Patents Nos. 2,096,545, 2,096,546 and 2,096,547, as may be seen by comparing Figures 2, 4 and 5 of the Jennings patent drawings with Figures 2 and 3 of the prior Jackson Patent No. 2,096,545, Figures 3 and 4 of the Jackson Patent No. 2,096,546, and Figures 3 and 4 of the

Jackson Patent No. 2,096,547. There is no evidence that it makes any difference whatever whether the switch arm is bimetal, as in Jennings, or whether it is not bimetal, as in Jackson, insofar as this distinction of pivotal movement about one pivot during normal opening and closing and about a second pivot point upon occurrence of overload is concerned.

It was not noted or recognized in the amendment quoted that the unitary switch arm and bimetal of the prior Taylor Patent No. 2,018,904 (Defendant's Exhibit 554) pivots about one point in manual operation and about another point also on overload release; nor was it noted or called to the attention of the Patent Office that the Jennings bimetal switch arm must rotate about two pivot points (37–47 and 61–63) in manual operation, and that it rotates about one of the same pivot points (61–63) on overload release.

The Circuit Master takes none of the advantages relied upon in urging the allowance by the Patent Office of the claims asserted to be infringed. Circuit Master does not attain the advantage, if any, of making the switch arm itself of bimetal and avoiding the manufacture of switch arm and bimetal as separate parts urged in distinguishing the claims from the prior Jackson patents above noted, for its bimetal and switch arm are separate parts and of different material and are secured together for operation by riveting after they have been separately manufactured. The advantage, whatever there may be, of pivoting the switch arm about one pivot point during normal opening and closing and about a second pivot point upon the occurrence of an overload, can be no more than that attained and disclosed in the prior Jackson patents above noted, and it can be no more than is attained in the prior Laganke Patent No. 1,789,183 which discloses essentially the same arrangement of handle and switch arm as Circuit Master and differs from Circuit Master in having the bimetal attached to the handle and latched to the switch arm, where Circuit Master has the bimetal attached to the switch arm and latched to the handle, both of which arrangements are substantially different from that of the Jennings patent, and neither of which is suggested by the Jennings patent. It was conceded in the application for the Jennings patent that the idea of attaching the bimetal to and making it a unitary part of the switch arm was disclosed to be old in the prior Taylor Patent No. 2,018,904.

Circuit Master contains and uses nothing of construction and operation that was not available in the art above noted prior to the Jennings patent.

Circuit Master does not respond to the claims of the Jennings Patent No. 2,229,412 asserted to be infringed when the claims are read and construed in the light of the Jennings drawings and specification and the terms thereof are given the meaning clearly intended in the Jennings specification.

With respect to the latching of the switch arm and its pivotal movement in manual operation, the Jennings specification clearly states that the latch piece 37, to which the switch arm latches, is fixed to the breaker casing and that it is the pivot point for the end 47 of the switch arm in normal or manual operation, and that the switch arm also has to pivot on an operating member 55 at 61–63 in manual operation. The specification states, page 1, col. 2, lines 54–55, page 2, col. 1, lines 1–6:

"Each terminal strip 11 is provided with a depending portion 31 adapted to seat in a recess provided therefor in the base 7, and an upwardly projecting portion 33. The upwardly projecting portion 33 is provided with a threaded opening 35 for threadedly receiving an adjustable latch piece 37."

On page 2, col. 2, lines 46–57:

"* * * it is well to note that the engaging surface of latch piece 37 with the end 47 of the switch arm 15 provides a normal pivot axis for the switch arm about which it is rotated between open and closed circuit position by the operating member 55 during manual operation of the breaker. It will also be noted that the compression spring 53 engages the bimetal switch arm 15 at a point adjacent *the pivotal* connection of the operating member 55 and the switch

arm 15 and between *said pivotal connection* and the end 47 of the switch arm."

On Page 2, col. 1, lines 44–52:

"The operating member 55 * * * is provided at its lower end with a reduced portion forming shoulders 62 and a projection 61 (Fig. 3) which is adapted to be received in a rectangular opening 63 provided in switch arm 15, thus providing a *pivotal coupling* between the operating member 55 and the switch arm 15." (Emphasis supplied.)

The "operating means" or "actuating means" specified in the claims is shown in the Jennings drawings and described in the specification to require the reciprocating operating member 55, a mechanical element separate and distinct from either the Jennings handle 57 or switch arm 15, and this operating member 55 is essential to the operation of the breaker disclosed in the Jennings patent. . The specification states, page 2, col. 1, lines 33–36:

"Each of the switch arms is provided with an individual operating means comprising, in general, a spring 53, an operating member 55, and an operating handle 57."

Claims 9 and 10 each call for—"a switch arm * * *, a latch piece engaging one point of said arm to provide a pivot point for said arm * * *, operating means (claim 9), actuating means including an operating handle (cl. 10)—for moving said switch arm about said pivot point—."

Claim 11 specifies—"a switch arm * *, a latching member normally engaging said arm to limit its movement to rotation about a pivot point, operating means for moving said arm about said pivot point—."

Claim 12 specifies—"an operating arm * * *, a latch member normally engaging one point of said arm to form a pivot point for said arm, operating means including an operating member pivotally engaging a second point of said arm for moving said arm about said pivot point—."

Claim 24 specifies—"a contact operating arm * * *, a latch piece normally engaging one point of said arm to provide for rotation of said arm about a pivot axis,

operating means including an operating member pivotally engaging a second point of said arm for moving said arm about said pivot axis—."

Applied to the circuit breaker structure described in the specification and disclosed in the drawings of the Jennings patent, "latch piece" or "latch member" refers to the latch piece or member 37 of the Jennings structure which is secured to the terminal 11–33 which is fixed to the breaker casing or base 7, and which in manual operation has pivotal engagement with and provides and forms a pivot point for the end 47 of switch arm 15. The term "operating means" or "actuating means" refers to and must include not only handle 57 but also the reciprocating operating member 55, in order to describe an operable structure in the Jennings specification. The term "engaging a second point" in claims 12 and 24 refers to the point 61–63 at which the reciprocating operating member 55 engages the switch arm 15.

In Circuit Master (Plaintiff Exhibit 26A, 27) latch piece P is part of handle B and is not a pivot point for switch arm C in manual operation or in overload operation. Where Jennings' switch arm 15 in manual operation has to pivot at two points (37–47) and (61–63), Circuit Master's switch arm C remains a unitary part of handle B and moves only with the handle about the handle pivot B¹. All of the Jennings claims referred to must be construed to include two pivotal movements of the switch arm 15 in manual operation, i. e., at 37–47 and at 61–63, as that is what the Jennings switch arms must do to operate. When the claims are read to require Jennings' switch arm to pivot about only one point (37–47) in manual operation, they are misdescriptive of the Jennings specification above quoted, describe a construction in the Jennings specification which would not operate and would be useless, and claim a structure which Jennings did not invent or disclose.

The term "operating means" specified in claims 9, 11, 12 and 24, or "actuating means" specified in claim 10, when applied to the circuit breaker structure described in the specification and shown in the drawings of the Jennings patent, require the in-

clusion of both the handle 57, and the reciprocating operating member 55 a mechanical element separate and distinct from either handle 57 or switch arm 15, in order to be operable, as stated in page 2, col. 1, lines 33–36 of the specification above quoted.

In Circuit Master the "operating means" or "actuating means" is spring G and handle B—there is no reciprocating operating member 55 between handle and switch arm such as is essential to the Jennings structure.

Defendant's Circuit Master does not respond to the essential specifications of claims 9, 10, 11, 12 and 24 when construed in the light of the Jennings specification and does not infringe those claims.

Claims 27, 28, 29 and 30, with immaterial variation of words, each contain the following specification—two pivot axes about which said switch arm is rotatable, manually engageable means operable to cause movement of said switch arm about one of said pivot axes—.

Applied to the Jennings specification, the term "two pivot axes" refers to the two pivot axes 37–47 and 61–63 about which the switch arm 15 moves in manual operation. The term "manually engageable means" must include the Jennings handle 57 and also reciprocating operating member 55, and these members must move the switch arm 15 about not only one pivot axis (37–47) but also about the second pivot axis (61–63) in manual operation in order to define an operable structure in the Jennings specification.

In Circuit Master the switch arm C is carried by the handle B and moves only with the handle about the handle pivot B¹ in manual operation, it does not rotate about two pivot points in manual operation as must the Jennings switch arm 15. In Circuit Master the "manually engageable means" includes only the handle B, it has no reciprocating operating member such as member 55 of Jennings and which is essential to the Jennings mechanical combination for operating the Jennings switch arm 15. Circuit Master does not respond to the essential specifications of the claims 27,

28, 29 and 30 and does not infringe those claims.

Claims 31, 33, 34, 35, 36 and 37, in the part which describes manual operation, when applied to the Jennings structure and construed in the light of the Jennings specification, specify the two pivot axes or points (37–47 and 61–63) about which the Jennings switch member 15 must pivot in manual operation; in the Circuit Master the switch arm C does not pivot about two axes or points in manual operation and does not respond to this essential specification of these claims.

Claims 32 and 38, in the parts which describe manual operation, do not specify the two pivot axes or points (37–47 and 61–63) about which Jennings switch member 15 must pivot in manual operation to be operable.

Claims 39 and 40 specify the two pivot axes (37–47 and 61–63) about which Jennings switch arm or bimetallic member (15–47), which are one and the same part, is movable, but in the immediately succeeding description of manual operation, these claims specify that the switch arm or bimetallic member (15–47) moves about only one of said pivot axes (37–47) in manual operation.

As previously pointed out, it is essential that Jennings' switch arm and bimetallic member (15–47) pivot about both pivot axes or points (37–47 and 61–63) in manual operation in order to be operable. Claims 32, 38, 39 and 40, considered in the light of the Jennings specification, must be construed to include and require movement of the switch arm and bimetallic member (15–47) about both pivot axes (37–47 and 61–63) in manual operation in order to describe an operable structure in the Jennings specification. When so construed, Circuit Master does not respond to this essential requirement of the claims as its switch arm C moves only with the handle B rotating on the handle pivot B¹ in manual operation. If construed to require only one pivotal movement of the switch arm and bimetallic member (15–47) in manual operation, these claims 32, 38, 39 and 40 fail to describe an operable structure in the Jennings specifica-

tion and claim more than Jennings invented and disclosed.

Claims 31 to 38, inclusive, each specify "operating means" for moving the switch member or current responsive element, which are one and the same part (15–47) in the Jennings structure, in manual operation to open and close the circuit. Claims 39 and 40 each specify "an operating member" for moving the bimetallic member, which is the switch member 15–47 in the Jennings specification, in manual operation to make and break the circuit.

These terms "operating means" and "operating member," construed in the light of the Jennings specification, must necessarily include the reciprocating operating member 55 of Jennings interposed between the handle 57 and switch arm 15, a mechanical element essential to the operation of the Jennings structure. Circuit Master does not contain or employ this mechanical element, the reciprocating operating member 55 of Jennings, between the Circuit Master handle and switch arm, the element is entirely omitted in the Circuit Master construction. The Circuit Master structure does not respond to this essential specification of the Jennings claims 31 to 40, inclusive, and does not infringe those claims.

Claims 39 and 40 also call for—"an assembly unit including a movable contact and a current responsive bimetallic member, * * *, a second terminal member and a flexible conductor * * *, said assembly unit * * * being positioned on the base with said movable contact and said bimetallic member free to move together about either of two axes,—."

In the Jennings specification and drawings this call of the claims refers to the movable contact 49 mounted upon the switch member which is the current responsive bimetallic member 15–47, the second terminal member 33 and the flexible conductor 83, which are positioned upon the base 7 of the breaker casing.

In Circuit Master (Plaintiff Exhibit 27) the sub-assembly unit is the switch arm C with the bimetal D and the movable contact E secured thereto, flexible conductor L connecting the bimetal D with the terminal M.

The switch arm C, bimetal D and movable contact E are positioned and held in the handle B and move as a unit with handle B, this unit is never assembled to the circuit breaker casing or base independent of the handle as in Jennings. Nor does Circuit Master have either of the two axes specified in the claims which correspond in function to the two axes or pivot points of the switch arm (37–47 and 61–63) upon both of which the Jennings switch arm and bimetal has to pivot in manual operation.

Defendant's Circuit Master circuit breaker does not respond to the terms of claims 9, 10, 11, 12, 24 and 27 to 40, inclusive, when those claims are construed in the light of the Jennings specification, and does not infringe those claims.

### Conclusions of Law

**1.**

■ The burden of proving infringement clearly rests upon the plaintiff, and that burden is not sustained in this case. Akro Agate Co. v. Master Marble Co., D.C., 18 F.Supp. 305, 335.

**2.**

■ None of the patents in suit are pioneer patents entitled to a wide range of equivalents; none of the devices shown in the drawings and described in the specifications thereof, except the Jennings Patent Re. 19,887, have had any material or substantial commercial success; all are improvements patents, and all are to be construed in the light of their respective specifications and drawings, and of the prior art, and limited substantially to the devices disclosed in their respective specifications and drawings. Demco, Inc., v. Doughnut Mach. Corp., 4 Cir., 62 F.2d 23, 25; Wheeling Stamping Co. v. Standard Cap & Molding Co., D.C., 60 F.Supp. 533, 537, affirmed 4 Cir., 155 F.2d 6, 8; Grubman Engineering & Mfg. Co. v. Goldberger, 2 Cir., 47 F.2d 151, 152, 153; Thompson v. Westinghouse Electric & Mfg. Co., 2 Cir., 116 F.2d 422, 425; Carl Braun, Inc. v. Kendall-Lamar Corp., 2 Cir., 116 F.2d 663, 665; Flowers v. Austin-Western Co., 7 Cir., 149 F.2d 955,

958, 959; Perry v. United States, 76 F.Supp. 503, 505, 112 Ct.Cl. 1.

### 3.

Defendant's circuit breakers, Circuit Master and Pushmatic, are not in any material or substantial respect similar to the devices disclosed in the drawings and specifications of the Sandin Patent No. 2,060,472, the Hodgkins Patent No. 2,073,103, the Jennings Patent No. 2,190,517, the Peterson Re. Patent No. 21,429, the Swingle Patent No. 2,329,362, or the Jennings Patent No. 2,229,412, and the drawings and specifications of those patents fail to suggest the construction of defendant's circuit breakers. None of those patents are entitled to any range of equivalents that will include defendant's Circuit Master and Pushmatic within their scope. The claims of those patents asserted to be infringed, when construed in the light of the specifications and drawings of the respective patents in which they are contained and given the meaning there intended fail to find any response in defendant's circuit breakers.

Consequently, the law and rules respecting the construction and infringement of patents, and the application of the doctrine of equivalents, established in Schumacher v. Cornell, 6 Otto 549, 556, 24 L.Ed. 676, 678; Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 573, 568, 18 S.Ct. 707, 42 L.Ed. 1136, 1147, 1149; Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 339 U.S. 605, 608, 609, 70 S.Ct. 854, 94 L.Ed. 1097; Demco, Inc. v. Doughnut Mach. Corp., supra; Wheeling Stamping Co. v. Standard Cap & Molding Co., supra; Grubman Engineering & Mfg. Co. v. Goldberger, supra; Thompson et al. v. Westinghouse Electric & Mfg. Co., supra; Carl Braun, Inc., v. Kendall-Lamar, supra; Flowers v. Austin-Western Co., supra; Perry v. United States, supra; applies in this case, and defendant has committed no infringement of any of the patents above designated by the manufacture and sale of either its Circuit Master or its Pushmatic circuit breakers.

### 4.

Jennings Patent Re. No. 19,887, claims 1, 4, 5, 6, 7 and 9, when construed in the light of the specification and drawings of the patent and in view of the prior art, are not infringed by defendant's Panelboard, Plaintiff's Exhibit 29.

Claims 4 and 7 of this patent are invalid for want of invention in view of the prior art. Westinghouse Electric & Mfg. Co. v. Powerlite Switchboard Co., 6 Cir., 142 F.2d 965.

Since plaintiff has entered no disclaimer of the claims 4 and 7 of Jennings Re. 19,887 held invalid in the prior suit, Westinghouse Electric & Mfg. Co. v. Powerlite Switchboard Co., supra, it has unreasonably neglected and delayed to file such a disclaimer, and in view thereof is not entitled to maintain this suit for infringement of claims 1, 5, 6, and 9, which were not adjudicated in said prior suit. 35 U.S.C.A. § 71, A. G. Triplett v. Lowell, 297 U.S. 638-649, 56 S.Ct. 645, 80 L.Ed. 949.

### 5.

The Sandin Patent No. 2,060,472 claims 8, 9, and 13 are invalid in view of the prior Hodgkins Patent No. 1,660,874, dated February 28, 1928, application filed July 15, 1920, and claim 13 is also invalid in view of the prior British Patent to Holmes No. 17,-888 of 1905, if construed broadly enough to cover and include within their scope the defendant's Circuit Master circuit breaker.

The Sandin patent claims 8, 9 and 13, construed in the light of the specification and drawings of the Sandin patent, are not infringed by the defendant's substantially different Circuit Master circuit breaker.

### 6.

The Hodgkins Patent No. 2,073,103, claims 31, 32, 33 and 44 are invalid in view of the prior patent to Krantz No. 1,726,233, dated August 27, 1929, if construed broadly enough to cover and include within their scope the defendant's Circuit Master circuit breaker.

The Hodgkins patent claims 31, 32 and 33 are invalid also in view of the prior German patent to Felten et al. No. 198,246, dated May 4, 1908, if construed broadly enough to cover and include within their scope defendant's Circuit Master circuit breaker.

Hodgkins patent claims 39 through 43, inclusive, are invalid in view of the prior

patent to Laganke No. 1,789,183, dated January 13, 1931, if construed broadly enough to cover and include within their scope either defendant's Pushmatic or Circuit Master breakers (claims 39–43, inclusive) are asserted against Pushmatic and claim 41 is also asserted against Circuit Master.

None of the claims of said Hodgkins patent asserted to be infringed by defendant, when construed in the light of the specification and drawings of the patent and in view of the prior art are infringed by either of defendant's Circuit Master or Pushmatic circuit breakers.

Hodgkins patent claims 39 through 43, inclusive, directed to the combination of a circuit breaker mechanism broadly stated and a casing providing a support and guide for the mechanism, are invalid for want of invention over the prior art represented by the prior patents to Weber No. 743,207, dated November 3, 1903, Aichele No. 1,732,-295, dated October 22, 1929, DeReamer No. 1,494,221, dated May 13, 1924, Ellis No. 1,-860,999, dated May 31, 1932, Gaynor No. 1,-969,263, dated August 7, 1934, application filed October 30, 1929, Getchell No. 1,886,-477, dated November 8, 1932, and Laganke No. 1,789,183, dated January 13, 1931. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Cutler-Hammer Mfg. Co. v. Beaver Machine & Tool Co., 2 Cir., 5 F.2d 457, 461–462; Vapor Blast Mfg. Co. v. Pangborn Corp., 4 Cir., 186 F.2d 230, 235, 236.

### 7.

The Jennings Patent No. 2,190,517 claims 15, 19, 21, 27, 31 and 35 asserted to be infringed by Circuit Master only, claims 22, 25, 28, 29 and 30 asserted to be infringed by Pushmatic only, and claims 20, 23, 32, 33 and 34 asserted to be infringed by both Circuit Master and Pushmatic, are invalid in view of prior patents to Laganke No. 2,-025,872, dated December 31, 1935, Weber No. 743,207, dated November 3, 1903, DeReamer No. 1,494,221, dated May 13, 1924, Ellis No. 1,860,999, dated May 31, 1932, Gaynor No. 1,969,263, dated August 7, 1934, Aichele No. 1,732,295, dated October 22, 1929, and the prior invention of Christensen

if construed broadly enough to cover and include within their scope the defendant's Circuit Master and Pushmatic circuit breakers.

None of the claims of the Jennings Patent No. 2,190,517 above designated and asserted to be infringed by defendant's Circuit Master or Pushmatic or by both Circuit Master and Pushmatic, when construed in the light of the specification and drawings of the Jennings patent and in view of the prior art, are infringed by either of the defendant's Circuit Master or Pushmatic circuit breakers.

All of the claims of the Jennings Patent No. 2,190,517 asserted to be infringed by defendant are directed to the combination of circuit breaker mechanism broadly stated and a casing having means for receiving the mechanism, and are invalid for want of invention over the prior art represented by the above designated prior patents to Weber, DeReamer, Ellis, Gaynor, Laganke, and Aichele. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra; Cutler-Hammer Mfg. Co. v. Beaver Machine & Tool Co., supra; Vapor Blast Mfg. Co. v. Pangborn Corp., supra.

### 8.

The Christensen circuit breaker disclosed in U. S. Patent No. 2,130,369, dated September 20, 1938, was conceived and constructed and successfully operated in tests prior to any date of invention to which Jennings is entitled for the circuit breaker of his patent No. 2,190,517, and therefore renders invalid claims 15, 19, 20, 21, 22, 23, 27, 28, 29 and 30 of Jennings Patent No. 2,190,517 which in all material respects describe the prior Christensen breaker. Automatic Weighing Machine Co. v. Pneumatic Scale Corp., Ltd., 1 Cir., 166 F. 288; Marconi Wireless Telegraph Co. v. United States, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731; United Chromium, Inc., v. General Motors Corp., 2 Cir., 85 F.2d 577; Christie v. Seybold, 6 Cir., 55 F. 69; Erben v. Yardley, 50 App.D.C. 43, 267 F. 345.

### 9.

Jennings' testimony respecting alleged conception and reduction to practice

of the circuit breaker of his Patent No. 2,190,517 prior to the conception and reduction to practice established for the Christensen circuit breaker is uncorroborated and cannot establish a date of invention for Jennings prior to that of Christensen. Shumaker v. Paulson, 136 F.2d 686, 30 C.C.P. A., Patents, 1156; Electro-Metallurgical Co. v. Krupp Nirosta Co., 3 Cir., 122 F.2d 314; Walker on Patents, Deller's Edition, Vol. 2, Sec. 201, p. 919; Bennett v. Sonnenfeld, 117 F.2d 762, 767, 28 C.C.P.A., Patents, 951.

### 10.

Petersen Re. Patent No. 21,429 claims 19 through 23, inclusive, and 25, alleged to be infringed by Pushmatic, are void on the ground that there was no evidence that the original patentee, Petersen, considered the subject matter which these claims cover to be his invention, or that Petersen considered his original Patent No. 2,076,385 inoperative or its specification defective or insufficient for failure to claim such subject matter, or that failure to claim such subject matter in the original patent arose through inadvertence, accident, or mistake, as required by 35 U.S.C.A. § 64, governing Reissue of Defective Patents. Freeman v. Asmus, 145 U.S. 226, 12 S.Ct. 939, 36 L.Ed. 685, 690; Peoria Target Co. v. Cleveland Target Co., 6 Cir., 58 F. 227, 238, 239, 240, 241, 244.

Petersen Re. Patent No. 21,429 claims 19 through 23, inclusive, and 25, are also void as being for an invention different from that claimed in the original patent by Petersen, in contravention of 35 U.S.C.A. § 64, governing Reissue of Defective Patents. Parker & Whipple Co. v. Yale Clock Co., 123 U.S. 87, 8 S.Ct. 38, 31 L.Ed. 100; United States Industrial Chemical Co. v. Carbide & Carbon Chemicals Corp., 315 U.S. 668, 675–676, 62 S.Ct. 839, 86 L.Ed. 1105, 1112.

### 11.

Petersen Patent Re. 21,429, claims 19 through 23, inclusive, and 25, when construed in the light of the specification and drawings of the patent, and in view of the prior art represented by the prior patents to Kerwin No. 1,502,785, dated July 29, 1925, Inaba No. 1,748,881, dated February 25, 1930, Baxter No. 1,535,559, dated April 28, 1925, Getchell No. 1,708,222, dated April 9, 1929, prior British Patent No. 401,957 of 1933, and prior U. S. Patent to Kendig Re. No. 17,650, dated April 22, 1930, Perkins No. 563,407, dated July 7, 1896, are not infringed by defendant's substantially different Pushmatic circuit breaker

### 12.

Petersen Re. Patent No. 21,429, claims 19 through 23, inclusive, and 25, if construed to cover and include within their scope the substantially different Pushmatic circuit breaker are invalid in view of the prior British Patent No. 401,957 of 1933, and also in view of the prior U. S. Patent to Kendig Re. No. 17,650, dated April 22, 1930.

### 13.

Swingle Patent No. 2,329,362, claims 27, 53, 54, 69, 70 and 76 through 80, inclusive, asserted to be infringed by defendant's Circuit Master circuit breaker must be construed to include two springs, one for manual operation to open and close the contacts and a second one to open the contacts on overload release, as essential to the operation of the circuit breakers described in the specification and disclosed in the drawings of the Swingle patent. If construed to require only one spring for both manual and overload operation, they are invalid for failure to describe an operable combination in the Swingle specification, and as claiming more than Swingle invented and disclosed. When construed to include the second overload opening spring essential to the operation of the circuit breakers shown and described in the Swingle specification, the claims are not infringed by defendant's substantially different Circuit Master which employs only one spring for both manual and overload operation and does not contain or employ the second spring for overload opening operation. State Bank of Chicago v. Hillman's, 7 Cir., 180 F. 732, 735–736; Burroughs Adding Mach. Co. v. Felt & Tarrant Mfg. Co., 7 Cir., 243 F. 861, 868, 869, 870; Consolidated Roller Mill Co. v. Walker, 138 U.S. 124, 11 S.Ct. 292, 34 L.Ed. 920, 923; Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47–61, 59 S.Ct. 8, 83 L.Ed. 34, 39;

Weil Pump Co. v. Chicago Pump Co., 7 Cir., 74 F.2d 13, 17; Wellman v. Midland Steel Co., C.C.Ind., 106 F. 221; McCaslin v. Link Belt Machinery Co., C.C.S.D.N.Y., 139 F. 393, affirmed 2 Cir., 147 F. 243; O. H. Jewell Filter Co. v. Jackson, 8 Cir., 140 F. 340; Pacific States Electric Co. v. Wright, 9 Cir., 277 F. 756.

### 14.

The circuit breakers shown and described in the Swingle patent, being substantially different from and failing to suggest the construction of the defendant's Circuit Master accused of infringement, having had no commercial use, and the Circuit Master construction in its essential characteristics resembling that of the prior patent to Laganke No. 1,789,183 and not Swingle, all claims of the Swingle patent charged to be infringed are to be construed as limited to substantially the circuit breaker construction described in the specification and shown in the drawings of the patent, and so construed, they are not infringed by defendant's Circuit Master circuit breaker. Schumacher v. Cornell, supra; Westinghouse v. Boyden Power Brake Co., supra; Demco, Inc. v. Doughnut Mach. Corp., supra; Wheeling Stamping Co. v. Standard Cap & Molding Co., supra; Grubman Engineering & Mfg. Co. v. Goldberger, supra; Thompson v. Westinghouse Electric & Mfg. Co., supra; Carl Braun, Inc. v. Kendall-Lamar Corp., supra; Flowers v. Austin-Western Co., supra; Perry v. United States, supra.

### 15.

Considered in view of the prior art and especially prior patent to Laganke No. 1,-789,183, dated January 13, 1931, which Circuit Master resembles in essential aspects of construction rather than Swingle, and prior patent to Krantz No. 1,726,233, dated October 27, 1929, which discloses all functions of the overcenter spring alleged to be novel in Swingle, and the fact that the circuit breakers described in the specification and disclosed in the drawings of the Swingle patent do not suggest the construction of Circuit Master and have attained no commerical use or importance, the Swingle Patent No. 2,329,362, claims 76 through 80, inclusive, written purposely in an attempt to cover the Circuit Master long after the Swingle application was filed and after plaintiff had learned of Circuit Master from defendant, are construed as limited substantially to the structures described in the specification and disclosed in the drawings of the Swingle patent and are not infringed by defendant's Circuit Master. Akro Agate Co. v. Master Marble Co., supra; Automatic Devices Corp. v. Sinko Tool & Mfg. Co., 7 Cir., 112 F.2d 335, 342; Union Special Machine Co. v. Wilcox & Gibbs Sewing Machine Co., D.C.E.D.Pa., 32 F.2d 924, 928; United Shoe Machinery Co. v. L. Q. White Shoe Co., D.C.D.Mass., 270 F. 650, affirmed in 1 Cir., 279 F. 35, 37; Galion Iron Works & Mfg. Co. v. Beckwith Machinery Co., D.C.W.D.Pa., 25 F. Supp. 73, 74, affirmed in 3 Cir., 105 F.2d 941; Demco, Inc., v. Doughnut Mach. Corp., supra; Wheeling Stamping Co. v. Standard Cap & Molding Co., supra.

### 16.

The Jennings Patent No. 2,229,412, claims 9, 10, 11, 12, 24 and 27 to 40, inclusive, asserted to be infringed by defendant's Circuit Master circuit breaker are construed, in view of the prior art and the fact that the circuit breaker structures described in the specification and disclosed in the drawings of the Jennings patent have had no commercial use and have in effect been abandoned by plaintiff in favor of circuit breaker structures of the prior art, and fail to suggest the structure of defendant's Circuit Master, as limited substantially to the structures described in the specification and disclosed in the drawings of the Jennings patent, and are not infringed by defendant's Circuit Master circuit breaker. Schumacher v. Cornell, supra; Westinghouse v. Boyden Power Brake Co., supra; Demco, Inc., v. Doughnut Mach. Corp., supra; Wheeling Stamping Co. v. Standard Cap & Molding Co., supra; Grubman Engineering & Mfg. Co. v. Goldberger, supra; Thompson v. Westinghouse Electric & Mfg. Co., supra; Flowers v. Austin-Western Co., supra; Perry v. United States, supra.

### 17.

The Jennings Patent No. 2,229,412, claims 9, 10, 11, 12, 24, and 27 to 40, inclusive, asserted to be infringed by defendant's Cir-

cuit Master circuit breaker are construed, in the light of the specification and drawings of the Jennings patent, to include as essential to the utility and operability of the circuit breaker there disclosed, in the manual operating "means" for the switch arm, a reciprocating operating member such as Jennings operating member 55 in addition to the handle 57, and two pivotal movements of the switch arm in manual operation. So construed, none of the claims asserted are infringed by defendant's Circuit Master which does not employ or contain any mechanical element such as Jennings' operating member 55, and in which the switch arm does not have two pivotal movements in manual operation. If construed to omit the essential reciprocating operating member between handle and switch arm and the two essential pivotal movements of the switch arm in manual operation, the claims fail to define an operative and useful structure in the Jennings specification and are void for claiming more than Jennings invented and disclosed. State Bank of Chicago v. Hillman's, supra; Burroughs Adding Mach. Co. v. Felt & Tarrant Mfg. Co., supra; Consolidated Roller Mill Co. v. Walker, supra; Schriber-Schroth Co. v. Cleveland Trust Co., supra; Weil Pump Co. v. Chicago Pump Co., supra; Wellman v. Midland Steel Co., supra; McCaslin v. Link Belt Mach. Co., supra; O. H. Jewell Filter Co. v. Jackson, supra; Pacific States Electric Co. v. Wright, supra.

### 18.

Considered in view of the prior art and especially the prior patent to Laganke No. 1,789,183, dated January 13, 1931, which Circuit Master resembles in essential features of construction rather than the structure of the Jennings Patent No. 2,229,412, the prior patent to Taylor No. 2,018,904, dated October 29, 1935, application filed July 11, 1933, disclosing switch arm and bimetal as a unitary part, and the prior patents to Jackson Nos. 2,096,545, dated October 19, 1937, application filed April 1, 1936, 2,096,546, dated October 19, 1937, application filed August 15, 1935, and 2,096,547, dated October 19, 1937, application filed August 15, 1935, disclosing the identical switch arm pivotal operation and means of Jennings, and in view of the fact that the circuit breaker structure disclosed in the specification and drawings of the Jennings patent do not suggest the construction of Circuit Master, have attained no commercial use, and in effect have been abandoned by plaintiff in favor of circuit breakers of the prior art, notably the said Jackson patents, the claims of the Jennings patent, Nos. 10, 11, 12, 24, and 27 to 40, inclusive, amended and added in the petition for renewal of the application for the Jennings patent purposely in an attempt to cover the Circuit Master after plaintiff had learned of the Circuit Master from defendant, are construed as limited substantially to the structures described in the specification and disclosed in the drawings of the Jennings patent, and are not infringed by defendant's Circuit Master. Akro Agate Co. v. Master Marble Co., supra; Automatic Devices Corp. v. Sinko Tool & Mfg. Co., supra; Union Special Mach. Co. v. Wilcox & Gibbs Sewing Mach. Co., supra; United Shoe Machine Co. v. L. Q. White Shoe Co., supra; Galion Iron Works & Mfg. Co. v. Beckwith Mach. Co., supra; Westinghouse v. Boyden Power Brake Co., supra; Demco, Inc. v. Doughnut Mach. Corp., supra; Wheeling Stamping Co. v. Standard Cap & Molding Co., supra.

### 19.

The circuit breaker structure described in the specification and disclosed in the drawings of the Jennings Patent No. 2,229,412 discloses only a simple reversal of parts, i. e., making the bimetal a part of the switch arm, instead of a part of the fixed terminal in the breaker casing, as it is in the prior Jackson Patents Nos. 2,096,545-6-7, and does not constitute patentable invention in view of the prior Jackson patents. The Jennings patent, and all claims thereof asserted to be infringed by Circuit Master, is invalid for want of patentable invention. Walker on Patents, Deller's Edition, Vol. 1, p. 195, Sec. 33.

### 20.

█ Patents for which the applications were filed in the Patent Office prior to any date of invention claimed for the

**876**

inventions of the patents in suit constitute prior art available for consideration in the construction of, and to invalidate patents in suit. Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 400, 46 S.Ct. 324, 70 L.Ed. 651; Denaro v. Maryland Baking Co., D.C.D.Md., 40 F.2d 513, affirmed in 4 Cir., 50 F.2d 1074; Detrola Radio & Television Corp. v. Hazeltine Corp., 313 U.S. 259–265, 61 S.Ct. 948, 85 L.Ed. 1319–1320.

21.

■ In order to anticipate and find invalid a patent for want of invention, it is not necessary that a complete anticipation be found in the single prior patent. Vapor Blast Mfg. Co. v. Pangborn Corp., 4 Cir., 186 F.2d 230, 235, 236; Triumph Explosive v. Kilgore Mfg. Co., 4 Cir., 128 F.2d 444, 447; Denaro v. Maryland Baking Co., D.C., 40 F.2d 513, 515, affirmed 4 Cir., 50 F.2d 1074.

22.

■ The construction to be given patents and their claims is a question of law for the Court. Hurin v. Electric Vacuum Cleaner Co., 6 Cir., 298 F. 76; Solomon v. Renstrom, 8 Cir., 150 F.2d 805, 808.

23.

■ Combination claims in a patent must be for an operative combination as described in the specification, and elements disclosed in the specification necessary for the operation of the combination there disclosed are to be implied in the claims which omit such elements, else the claims are invalid for claiming more than invented and disclosed in the specification. Wellman v. Midland Steel Co., supra; McCaslin v. Link Belt Machinery Co., supra; O. H. Jewell Filter Co. v. Jackson, supra; Pacific States Electric Co. v. Wright, supra; State Bank of Chicago v. Hillman's, supra; Burroughs Adding Mach. Co. v. Felt & Tarrant Mfg. Co., supra; Consolidated Roller Mill Co. v. Walker, supra; Schriber-Schroth Co. v. Cleveland Trust Co., supra; Weil Pump Co. v. Chicago Pump Co., supra.

24.

■ The presumption of validity inhering in the grant of a patent by the Patent Office is prima facie only and not controlling on the independent judgment of the Court. National Machine Corp., Inc. v. Benthall Machine Co., Inc., 4 Cir., 241 F. 72, 77; Young v. John McShain, D.C.D. Md., 39 F.Supp. 521, 525, affirmed 4 Cir., 130 F.2d 31; Vischer Products Co. v. National Pressure Cooker Co., D.C.W.D.Wis., 71 F.Supp. 973, 976, affirmed 7 Cir., 178 F.2d 125, 127; Frank Adam Electric Co. v. Colts Patent Fire Arms Mfg. Co., 8 Cir., 148 F.2d 497, 502; Crosley Corp. v. Westinghouse Electric & Mfg. Co., 3 Cir., 152 F.2d 895, 904; Ajax Hand Brake Co. v. Superior Hand Brake Co., 7 Cir., 132 F.2d 606, 612; H. Schindler & Co. v. C. Saladino & Sons, 1 Cir., 81 F.2d 649, 651; Cleveland Punch & Shear Works Co. v. E. W. Bliss Co., 6 Cir., 145 F.2d 991, 999.

### Misuse of Patents Defense

■■ The defendant advanced, as a defense separate and distinct from non-infringement, the argument that the plaintiff had so misused its patents as to prohibit any recovery in this case. It was claimed that Westinghouse had used these patents in combination with patents owned by other companies to control and fix prices in the field involved. On a motion for summary judgment, I ruled with the defendant on this question, but was reversed by the Court of Appeals. It is true that the issues on a summary judgment differ from the issues in the trial of a case. It is also true that my ruling already made, that neither Circuit Master nor Pushmatic infringe any of the claims asserted against them by the plaintiff, renders this defense of misuse a moot question. However, since other courts may not agree with me on the first question, I feel I should decide the misuse of patents defense. As to this defense I must find in favor of the plaintiff.

### Findings of Fact

a. The Multi-Breaker Agreements.

1. Defendant's Multi-breaker licenses set out in Exhibit 592 are all non-exclusive and none of them contains any right to grant sublicenses.

2. Westinghouse granted Multi-breaker licenses only under its own patents and

price control thereunder, as long as it existed, was solely under the Westinghouse patents.

3. Westinghouse and the Square D Company, with which Westinghouse is alleged to have conspired to fix prices, each retained full control over its own patents and neither was given any right to grant licenses or non-assertions under patents of the other. There was no combining of the patents of the two companies in the hands of either company.

4. Price control under the Westinghouse Multi-breaker licenses was completely discontinued on April 9, 1948.

5. All limitations in the original Multi-breaker licenses in respect to the form of the licensed Circuit breakers were completely waived by plaintiff in 1942.

6. Westinghouse and Square D acted independently in granting rights under their respective patents and not in concert, as shown by the fact that the Federal Electric Products Company had a license under the Westinghouse patents on Multi-breakers for about two years without having rights under the Square D patents, and as shown by the fact that when Westinghouse in 1942 waived the limitation to the grant under its patents with respect to the form of the licensed devices, Square D did not do likewise with respect to its patents.

7. None of the other matters urged by defendant in its brief as showing an "intimate relation" between Westinghouse and Square D involve any conspiracy in restraint of trade or other illegality or wrongdoing under the decision of the Court of Appeals on a motion for summary judgment in this case, 179 F.2d 139. All such matters are based on the license agreements (contained in Exhibit 592) which were before that Court and nothing new in respect thereto was offered in evidence at the trial.

b. The AB Circuit Breaker Agreements.

8. Nothing new was presented at the trial with respect to these agreements (which the Court of Appeals found unobjectionable in the decision above mentioned) except that it appeared from the testimony that Westinghouse at one time entered into supplementary agreements with two of its AB licensees (Colt's Patent Fire Arms Manufacturing Co., and I-T-E Circuit Breaker Co.) providing that they would not assert certain patents against Westinghouse or against other Westinghouse licensees. No letters of non-assertion were ever sent to any of such other licensees and, so far as appears, they never even knew that they had the benefit of the non-assertion agreements.

9. Westinghouse never had an exclusive license under the patents of either Colt's or I-T-E, so these companies were not prevented from granting licenses to any one under their respective patents, and on any terms that they wished.

10. The price limitations of the AB license agreements were based solely on the Westinghouse patents.

11. No part of the royalties received by Westinghouse from other licensees were paid to Colt's or I-T-E.

12. The non-assertion agreements above mentioned no longer exist, having been terminated two or three years ago.

c. The Alleged Multi-Breaker Tying.

13. There was no attempt by Westinghouse in its Multi-breaker licenses or otherwise to extend its patent monopoly beyond the scope of its patents. The licensees were licensed to manufacture and sell complete "load centers, panel-boards, industrial-type circuit breakers, meter service or service entrance circuit breakers incorporating one or more latching contact bar type circuit breakers," which was merely a restricted form of license defining the field for which the license was granted, such as has been held to be proper in such cases as General Talking Pictures Corp. v. Western Electric Co., 305 U.S. 124, 127, 59 S.Ct. 116, 83 L.Ed. 81, and Automatic Radio Mfg. Co. v. Hazeltine, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312. Furthermore, the patents under which the licenses were granted included patents on the complete assemblies, among them being the Jennings Reissue patent 19,887 here in suit.

14. This alleged defense is based solely on the license agreements which were before the Court of Appeals on the appeal on the motion for summary judgment. West-

inghouse Elec. Corp. v. Bulldog, 4 Cir., 179 F.2d 139.

d. The Alleged Iredell Patent Tying.

15. Defendant's contention that there was illegal tying of its Iredell Patent (No. 1,982,812) on contacts with its circuit breaker patents is not supported by the facts, since in no case was the grant of a license under Iredell conditioned upon the licensee taking a license under other patents, and in no license granted was the use of the Iredell contacts limited to circuit breakers covered by any other patent or patents.

16. There is no evidence that Westinghouse ever refused to grant any one a license under the Iredell patent or (as noted above) that it ever conditioned the grant of a license under Iredell on the taking by the prospective licensee of a license under the Westinghouse circuit breaker patents.

17. The evidence shows that the defendant never asked plaintiff for a license under the Iredell patent and was never refused a license under that patent.

18. The defendant at one time did have a license under Westinghouse circuit breaker and contact patents and, while the Iredell patent was not listed therein since it had not issued at the time the license was granted, it appears that rights under it were included since the license specifically included Jennings patent 1,802,718 on contacts as well as all other "subservient" or "improvement" patents and the Iredell patent is subservient to said Jennings patent. Under that license Bulldog could have used the Iredell contacts in circuit breakers whether the latter came under other Westinghouse patents or not. Defendant cancelled this license as of June 1, 1940.

19. Defendant offered evidence to show that the Stackpole Carbon Company, a licensee of Westinghouse under the Iredell patent for fields other than circuit breakers and electric appliances, refused to sell contact material under that patent to defendant. However, this was only after the defendant had cancelled its license and, since neither Stackpole nor Bulldog at that time had a license under Iredell for circuit breakers, Stackpole's refusal was presumably based on its unwillingness to infringe the Iredell patent. There was no prohibition in the Stackpole license against selling contacts to unlicensed circuit breaker manufacturers but its license merely did not extend to that field, being thus a limited license which the courts have held to be proper as above stated.

20. The Stackpole license, although not extending to the circuit breaker field, permitted sale of contact material to circuit breaker manufacturers who had licenses under the Iredell patent and who therefore had the right to manufacture the material for themselves or, in the absence of express prohibition, to have it manufactured for them. The use of the term "indivisible" in the Westinghouse circuit breaker licenses which included the Iredell patent did not constitute such a prohibition but merely meant that no part of the license could be assigned to another.

21. A new license (Exhibit 594) was granted by Westinghouse to Stackpole effective January 1, 1950, which replaced the former license (Exhibit 593) and grants rights under the Iredell patent alone for all fields, so that since that date any one could buy Iredell contacts for whatever use he wished to make of them.

e. Purge.

22. Even if, contrary to the conclusions herein stated, it could be considered that any of the matters urged by defendant constituted a misuse of plaintiff's patents, any such possible misuse has been fully purged.

23. There has been no price control under the Multi-breaker licenses since April 9, 1948. On January 4, 1950, the Court of Appeals rendered its decision above mentioned in which it said at page 145 of 179 F.2d that "any illegality that may have existed has been purged" (by the waiver on April 9, 1948, of the price provisions) and at page 143 of 179 F.2d that there is "nothing to indicate that any conspiracy in restraint of trade has existed with respect to multibreakers or any contractual or other limitation on prices which was not dissipated as a result of the waiver." The alleged Multi-breaker tying matter was before that Court in the license agreements and was thus impliedly held to be unob-

jectionable since it was said that any illegality or conspiracy in restraint of trade had been purged.

24. Nothing is now before this Court in this connection which was not before the Court of Appeals except alleged similarity or uniformity of prices of certain items only of Multi-breaker equipment of Westinghouse and certain (but not all) of its licensees for a period some time subsequent to the decontrol of prices on April 9, 1948, which items, among others, are listed in the catalogs and discount sheets comprising Defendant's Exhibits 609–612. This evidence is incomplete and inconclusive since the price material shows that even on the selected items the catalog prices were different much of the time and that even such uniformity as was shown was not effected by changes made at about the same time, as would be expected if the uniformity had been based upon agreement between Westinghouse and such licensees.

25. It further appeared from the testimony that the actual prices at which sales were made by Westinghouse and at least some of its licensees were lower than the catalog prices on half or more of the sales and that prices were cut where it was necessary in order to meet competition. There was also evidence that uniform or closely similar catalog prices often resulted from competition rather than from lack of it, some witnesses having stated that it was regarded as necessary to quote the same or similar prices as principal competitors in order "to be competitive," even though sales were not necessarily made at the quoted prices.

26. The evidence fails to show that there was any agreement or understanding between Westinghouse and any of its licensees respecting prices after price control was eliminated, and the indications are to the contrary, as was the direct testimony of Westinghouse witnesses. It is hereby found that there was no such agreement or understanding.

27. Regarding the AB licenses, which were found unobjectionable by the Court of Appeals but from which price control was nevertheless eliminated on February 11, 1949, it is likewise found that there has been no agreement or understanding with respect to prices since the elimination of price control and that if there were any effects of such control to be dissipated, this has been fully accomplished since that time.

28. With respect to the non-assertion agreements entered into by Colt's and I-T-E with regard to AB breakers when price limitations were in effect, there was nothing wrongful requiring a purge, but if there had been, a complete purge was effected by the elimination of all price control with respect to AB breakers on February 11, 1949, and by the termination of the non-assertion agreements at about the same time.

29. As to the alleged tying under the Iredell patent, the replacement of the original Stackpole agreement on January 1, 1950, has purged any possible illegality or impropriety, although, as set out in the conclusions below, there was none.

### Conclusions of Law

1. There has been no misuse of patents by plaintiff which would bar relief to it had there been an actual infringement by defendant of the patents here in suit.

2. Nothing in this case brings it within the case of United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701, in which the patents of two companies were exclusively pooled in the hands of one of them, with the exclusive right in it to grant sub-licenses under the patents of the other.

3. Any possible misuse by plaintiff has been completely purged and the effects thereof fully dissipated.

### Final Conclusions

Plaintiff's complaint shall be dismissed.

Defendant shall recover its proper costs sustained in the defense of this suit. I do not feel that plaintiff's claims were so completely unsubstantial as to permit recovery of attorneys' fees for the defendant.

Counsel are directed to agree upon an order, if possible. If not, I will set a time and place for hearing them upon the form of such order.